[No. S018637. Aug. 11, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JACKIE RAY HOVARTER, Defendant and Appellant.

984

## COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, and Denise Kendall, Assistant State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—A Humboldt County jury convicted Jackie Ray Hovarter in 1988 of the first degree murder of Danna Elizabeth Walsh. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) It also convicted defendant of kidnapping and forcibly raping Walsh (§§ 207, subd. (a), 261, former subd. (2), now see *id.,* subd. (a)(2)) and sustained special circumstance allegations that he murdered Walsh while engaged in the commission of a kidnapping and rape (§ 190.2, former subd. (a)(17)(ii) & (iii), now subd. (a)(17)(B) & (C)). The jury was unable to reach a verdict as to penalty, and the trial court declared a mistrial. Defendant, with the agreement of counsel, waived his right to a jury for the penalty retrial, and in 1989, the trial court, sitting as the trier of fact, returned a verdict of death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

As explained below, we conclude the guilt and penalty judgments should be affirmed in their entirety.

I. GUILT PHASE

A. *Facts*

1. *Discovery of Danna Walsh's Body*

A young teenager and three friends went fishing along the Eel River in Scotia, Humboldt County, on August 24, 1984. Afterwards, they stopped near the Scotia/Rio Dell Bridge and discovered the body of a young woman. Finding no pulse, they summoned the police. The police examined the body, which lay along the river about 150 yards from the water. The victim was fully clothed except for shoes and socks. Her panties were inside out, and although they were damp at the bottom, they were dry at the top. Some yellow nylon rope was wound several times around her neck. Subsequent investigation determined the victim was Danna Elizabeth Walsh, who had been reported missing in Willits.

2. *Circumstances Surrounding Walsh's Disappearance*

Louisiana-Pacific Corporation operated a pulp mill in Samoa, California, near Eureka. The mill began loading trucks with woodpulp around 7:00 a.m., but truckers arrived early to get in line, as the first truck in line was the first to be loaded and thus the first to leave. Employees at the mill's front gate noted in a log the name of the driver, the trucking firm, either the vehicle registration number or license plate number of the truck, and the time each truck entered the mill. After receiving their load of woodpulp, the truckers departed and a gate employee noted in the same log the departure time of each truck.

Defendant lived in San Pablo in the Bay Area and drove a truck for a living. On a typical day he would leave his home around 10:00 p.m. and drive north on Highway 101 to the Louisiana-Pacific pulp mill, generally arriving shortly after 4:00 a.m. He would then wait until 6:30 or 7:00 a.m., have his truck loaded, and drive it down to the container yard in Oakland. Jack Davis, the shipping foreman, testified defendant was usually one of the first truckers in line and was generally already in line when Davis arrived at the mill at 6:00 a.m. On the two days prior to Walsh's murder, the logsheets showed defendant had arrived at the mill at the usual time, 4:07 a.m. and 4:09 a.m., respectively. On August 24, 1984, the day of the murder, however, he did not arrive until 6:28 a.m.

Before the murder, Walsh visited her older brother, Randy Robertson, in San Ramon. She came to the Bay Area with a friend named Melinda in order

to buy school clothes. She took a bus back to Willits around 8:30 or 9:00 a.m. on Thursday, August 23, 1984.

Dennis Haun, 21 years old in 1984, lived in Willits in a house approximately one-quarter mile from Highway 101. He admitted to having had a sexual relationship with Walsh. On August 23, 1984, Haun encountered Walsh with some of her friends around 6:00 or 7:00 p.m. in the parking lot of the Safeway grocery store. The group decided to go to Haun's house for a party. The group was drinking, and when he and Walsh went into the bedroom together he was "pretty well drunk." He passed out and was "not positive" whether or not he had had sex with Walsh. When he awakened later that night, naked, he found Walsh gone.

Francis McKinnon was working the graveyard shift—midnight to 8:00 a.m.—at the Circle K convenience store in Willits in August 1984. The store is located on Highway 101. She knew Walsh by name and by sight, but did not know her personally. McKinnon saw Walsh enter the store in the early morning hours—sometime after midnight but before 2:00 a.m.—on August 24, 1984. Walsh appeared to be alone, and she asked McKinnon if she had seen a boy in a red hat. McKinnon told her she had not. Walsh left the store, turned left, and walked in the direction of Highway 101. She appeared upset and could have been crying. After Walsh's murder, police showed McKinnon some photographs; she recognized defendant's picture as someone who previously had been in the store, but she could not be sure when.

### 3. *Forensic Evidence*

A medical examination determined Walsh had been killed by asphyxia due to strangulation, resulting in the deprivation of oxygen to her brain. Under such circumstances, the brain will die within five to eight minutes. The hyoid bone in her throat was fractured, and her larynx was bruised. She had apparently been thrown or dropped from the bridge, landing on her left side, and probably striking some trees on her way down. Some "faint red marks" on her ankles suggested the possibility she had been bound with some soft material. Her jeans and underwear bore evidence of urine. Her bladder was about half full; sometimes a person's bladder will empty partially or completely at death.

Walsh's body bore no evidence of sexual trauma to suggest that she had been raped. Vaginal swabs of the victim, however, revealed the presence of sperm, although testing of two separate vaginal swabs for blood type, PGM (phosphoglucomutase) enzymes, and secretor status of possible donors was inconclusive, partially because it could not be determined whether Walsh herself was a secretor or a nonsecretor, and partially because of the possibility

that she had recently had sexual intercourse with Dennis Haun. Based on the fragmentary blood evidence, however, defendant could not be eliminated as the donor of the sperm.

Comparing the body's temperature and the ambient temperature, a pathologist estimated Walsh had been killed around 5:00 a.m. on August 24, 1984.

### 4. *Crimes Against A.L.*

Before the trial in this case, defendant was convicted of the rape, kidnapping, and attempted murder of A.L. The crimes against A.L. were committed four months after the murder of Walsh. The trial court admitted the evidence of these offenses in defendant's trial for the kidnap, rape, and murder of Walsh.

A.L. testified that on December 11, 1984, she was a 15-year-old 10th grader living in Fields Landing near Eureka, Humboldt County. She usually took an 8:00 a.m. bus to her school in Fortuna, but missed it that day so she started hitchhiking. Defendant, driving his brown truck and wearing a maroon shirt, stopped to give her a ride. He did not stop in Fortuna, however. He eventually pulled off the highway and pulled out a short, rusty pocketknife. A.L. grabbed for the knife, cutting her finger. When she attempted to get out of the truck, defendant pulled her back in and said he would not hurt her if she cooperated.

Defendant pushed A.L. into the sleeper compartment of the truck and told her to remove her clothes. She complied, and he bound her with black electrician's tape. He touched her vagina, but then decided to drive somewhere safer. As he drove, A.L. tried to bite off the tape binding her, but defendant told her to stop. She noticed a silver-colored revolver in the truck. Around this time, defendant told her he knew what he was doing. Defendant eventually stopped the truck and tied her hands with strips of cloth cut from a T-shirt. He then raped her before starting up the truck again.

A.L. saw a sign for Willits and realized they were driving south. Defendant told her he would find a safe place and then leave her blindfolded, tied to a tree. He also told her he could not live in jail and that he would die if sent to jail. At some point, defendant stopped the truck near the Russian River. He allowed A.L. to dress and then the two of them got out of the truck. A.L.'s hands were still bound, and she noticed defendant was carrying a pillow. Defendant led her down to the river and then tied her to a tree. He took the gun from his pocket and placed the pillow over it. A.L. asked him whether he was going to shoot her. He said he would not and then shot her in the head. She became dizzy, fell to the ground, and tried to remain motionless.

Defendant kicked her twice and asked her whether she was dead. He then shot her in the head again. Miraculously, neither bullet penetrated her cranium. Defendant untied her from the tree, dragged her to the river, and tried to roll her in. She got into the current and floated away, managing to untie her hands. She made her way to the other side of the river and obtained help. When police took her to the spot where defendant had shot her, part of a T-shirt was still tied to the tree. She covered her face and began to cry.

A.L. positively identified defendant and his truck. She recalled that a crocheted horse was hanging from the truck's mirror and the truck's dashboard had red, blue, and yellow knobs on it. She also noticed defendant had a heart-shaped tattoo on his arm that read "Jack." Based on A.L.'s evidence, police arrested defendant and searched his house. They found a maroon shirt similar to the one described by A.L., as well as a nickel-plated revolver. His arm bore a tattoo just as A.L. had described. A search of his truck revealed a crocheted horse, colored knobs on the dashboard, a roll of black electrician's tape, and a torn T-shirt, all corroborating A.L.'s story. Bloodstains inside the truck were consistent with A.L.'s blood and inconsistent with defendant's blood. Police also found A.L.'s fingerprints inside the truck.

### 5. Testimony of Gary Marolla

Gary Marolla encountered defendant when both were in jail in Mendocino County. Defendant told him about his crimes against A.L. and the crimes against Walsh. According to Marolla, defendant said he was driving his big rig truck on his way to work when he picked up a blonde girl in Willits. He drove north with her, raped her twice, and then killed her in Rio Dell. Defendant said he attempted to strangle the girl with his arm but she voided her bladder, which angered him. He then tied a rope around her neck and strangled her. Once she was dead, he dumped her lifeless body off a bridge in Rio Dell around 4:00 or 4:30 a.m. He tried to drop her into the water beneath the bridge, but she landed on the ground next to the river. Defendant said he then continued on his way to work. According to Marolla, defendant said he killed the girl from Willits before he committed his crimes against A.L. Although he strangled the first girl, he told Marolla that he decided to shoot the second one to avoid the possibility that she too would urinate on him.

Marolla admitted he had prior felony convictions for escape and robbery in 1965 and for the same crimes in Nevada in 1974. He admitted he had gone to a house in the Leggett area (Mendocino County) in December 1984 to buy some marijuana and that he had been armed with a machine gun with a silencer, had other firearms in his car, and had left the male residents of the house tied up. He was allowed to plead guilty to possession of a machine gun and a silencer in exchange for dismissal of the other charges. He also

admitted that in exchange for his testimony against defendant, he had been sentenced for these crimes to probation with credit for time served (111 days) and that he had been released immediately after testifying at defendant's preliminary examination. He declined to identify the person who had sold him the machine gun, but opined that he might reveal the name if he were paid $100,000.

Marolla admitted speaking to law enforcement officers more than once about various crimes for which he had information, and although he denied seeking to trade that information for his freedom, he conceded he listened to other people talk about their crimes with the goal of hearing some useful information. He would have revealed the name of the person who employed him to buy the marijuana but asserted that police did not "make it worth my while." He also tried to peddle information about a drug laboratory in Santa Cruz and a murder case in Trinity County, but could not reach an agreement with law enforcement.

When he encountered defendant in jail, Marolla revealed to him his prior commission of a kidnapping and a rape, as well as his previous involvement in slave trafficking. Marolla also admitted he smoked marijuana in jail and shared some with defendant. Defendant eventually confided in him as well, telling Marolla about his own crimes. Marolla took this information to his attorney, who eventually negotiated a deal with Mendocino County law enforcement authorities.

During cross-examination, the following exchange occurred:

"[DEFENSE COUNSEL]: Q. But would it be fair to say that there was only one thing that you were interested in, and that was getting out of jail at that point?

"[WITNESS MAROLLA]: A. Of course, that's all you're interested in really when you're in jail.

"Q. Would it be fair then to say that was the only thing you were interested in at that point was getting out of jail?

"A. I wouldn't say the only thing. I was interested in it. Yes.

"Q. It was primarily important to you?

"A. It was important. Yes."

Further cross-examination probed possible inconsistencies between Marolla's trial testimony and his prior statements to police. For example,

Marolla admitted it was "possible" that when he first spoke to law enforcement about defendant's admissions, he (Marolla) did not mention that defendant had said the girl was from Willits. He was evasive or vague when asked whether the Rio Dell victim was an older woman or a younger girl, whether a rope had been left wound around her neck or not, and whether defendant had said he raped her. Marolla later clarified that he had told police he did not know whether a rope had been left on the victim and that it was possible he had initially told police the Rio Dell victim was an older woman.

Marolla's prior crimes did not represent the end of his criminal activities. He admitted that while on probation for the machine gun charges he had been arrested in Shasta County for growing marijuana, but was granted diversion. He had also been found to be in possession of a sawed-off shotgun in violation of his probation but was not prosecuted for the crime, and it did not affect his eligibility to receive diversion.

Marolla denied reading newspaper accounts of the Walsh murder and admitted he had a bad memory. He testified he took medication for epilepsy that affected his memory. When asked whether he recalled threatening to kill defense counsel when counsel upset him by calling him a liar, Marolla denied making the threat. Marolla explained: "I didn't threaten you. I said I'd have a perfect alibi and that you would die. I didn't threaten you in the least. There's a difference."

B. *Discussion*

1. *Admission in Evidence of Marolla's Testimony*

Defendant raises a multifarious challenge to the trial court's decision to admit Gary Marolla's testimony. As described, *ante*, Marolla was not the most sterling witness, demonstrating an evasive and truculent mien on the stand. Experience shows that criminals often confide in other criminals and, accordingly, prosecutors must often take their witnesses as they find them. Through cross-examination and defense counsel's closing argument, the jury was made well aware of Marolla's substantial criminal history, his efforts to uncover information from other jail inmates that he could trade for his freedom, and his eventual deal with prosecutors for a favorable outcome for his own legal troubles. As we explain, the trial court did not err in denying defendant's motion to exclude Marolla's testimony.

■ Defendant first argues that in light of Marolla's dubious background, his obvious motive to fabricate evidence for his own benefit, and the

inconsistency of his statements,[1] his testimony should have been excluded as inherently unreliable and insufficient to support the verdict.[2] But defendant's claim does not identify a legal ground for exclusion of otherwise relevant evidence. Marolla was naturally subject to impeachment for motive and bias. He could also be cross-examined and asked to explain inconsistencies between what he told police in a pretrial interview and his trial testimony. But his testimony was not "so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt." (*United States v. Chancey* (11th Cir. 1983) 715 F.2d 543, 546.) We thus agree with respondent that no rule of evidence authorized the trial court to exclude Marolla's testimony merely because his character was reprehensible and he had a motive to lie. As we have explained: "We are skeptical of the claim that the testimony of an ordinary witness who claims to have heard the confession or damaging admission of a criminal defendant may be excluded from evidence on the ground that it is inherently improbable. Generally, 'doubts about the credibility of [an] in-court witness should be left for the jury's resolution.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 735 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution . . . ." (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

■ Defendant recognizes this general rule, but argues "[t]he question of Marolla's reliability is not simply a determination of credibility for the jury. Although it is true that the trier of fact is the sole arbiter of the credibility of a witness, this court must ensure the evidence is reasonable, *credible*, and of solid value." (Italics added.) Defendant confuses two standards. *At trial*, "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].) *On appeal*, an appellate court deciding whether sufficient evidence supports a verdict must determine whether the record contains substantial evidence—which we repeatedly have described as evidence that is

---

[1] For example, although Marolla testified that defendant told him he left the rope on Walsh when he dropped her off the bridge, he told Detective Ron Gourley from the Mendocino County Sheriff's Department that he was not sure whether or not defendant had told him he left the rope on and, later, that defendant could not remember whether he had done so. Also, although Marolla testified in definite terms that defendant told him he raped Walsh twice, Gourley contradicted Marolla on this point, testifying that Marolla had told him he was not sure about the rape.

[2] We need not resolve the claim that Marolla's evidence was insufficient to sustain the convictions, for there was other evidence—A.L.'s testimony, forensic evidence, the trucking logsheets—which together with Marolla's evidence proved the case against defendant. We address defendant's claims challenging this other evidence, *post*.

reasonable, credible, and of solid value—from which a reasonable jury could find the accused guilty beyond a reasonable doubt. (See, e.g., *People v. Halvorsen* (2007) 42 Cal.4th 379, 419 [64 Cal.Rptr.3d 721, 165 P.3d 512].) "In evaluating the sufficiency of evidence, 'the relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt' [citation], but 'whether " '*any* rational trier of fact' " could have been so persuaded.' . . ." (*People v. Hernandez* (2003) 30 Cal.4th 835, 861 [134 Cal.Rptr.2d 602, 69 P.3d 446].) Because a rational trier of fact could have found Marolla credible, we reject the claim that the trial court should have excluded his testimony as inherently incredible.

■ Second, defendant argues testimony from jailhouse informants is of "questionable reliability," observing the Legislature has explicitly recognized such unreliability by enacting section 1127a.[3] Thus, consideration of the fact Marolla was a jailhouse informant, "in combination with other factors, renders his testimony unreliable." But section 1127a, which requires a special jury instruction directing juries to give "close scrutiny" to the testimony of informants, does not require *exclusion* of such evidence. Moreover, as defendant concedes, section 1127a was enacted after his trial, and "we consistently have rejected the contention, made in connection with capital appeals, that informant testimony is *inherently* unreliable." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1008 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Finally, as we explain in more detail in part I.B.6., *post*, the jury was instructed, in

---

[3] Section 1127a, enacted in 1989, provides: "(a) As used in this section, an 'in-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution.

"(b) In any criminal trial or proceeding in which an in-custody informant testifies as a witness, upon the request of a party, the court shall instruct the jury as follows:

" 'The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.'

"(c) When the prosecution calls an in-custody informant as a witness in any criminal trial, contemporaneous with the calling of that witness, the prosecution shall file with the court a written statement setting out any and all consideration promised to, or received by, the in-custody informant.

"The statement filed with the court shall not expand or limit the defendant's right to discover information that is otherwise provided by law. The statement shall be provided to the defendant or the defendant's attorney prior to trial and the information contained in the statement shall be subject to rules of evidence.

"(d) For purposes of subdivision (c), 'consideration' means any plea bargain, bail consideration, reduction or modification of sentence, or any other leniency, benefit, immunity, financial assistance, reward, or amelioration of current or future conditions of incarceration in return for, or in connection with, the informant's testimony in the criminal proceeding in which the prosecutor intends to call him or her as a witness."

determining the credibility of witnesses, to consider their prior felony convictions, the existence of any bias, interest, or motive to lie, and their inconsistent statements, if any. The jury was thus well equipped to evaluate Marolla's testimony.

Third, defendant contends Marolla's unreliability as a witness was persuasively demonstrated after trial when Marolla called defense counsel and claimed he had lied in defendant's trial. As we explain, this new evidence regarding Marolla's trustworthiness was speculative, fully aired, and rejected by the trial court. Accordingly, we conclude there was no substantial evidence that Marolla lied.

The facts are these: Following the penalty phase verdict, counsel moved for a new trial. Before the trial court could act on the new trial motion, counsel filed a declaration in support of a continuance, explaining that he had received a telephone call from Marolla in March 1990. Marolla told him "he had lied in his testimony [in defendant's case]. He said that [defendant] did not tell him anything about the Mendocino case [i.e., the A.L. case], but that such information was provided to him by law enforcement. [¶] He said that he was now dying and had to get this off his chest. He said he felt responsible for having 'put him there' (i.e., potentially sending Defendant to Death Row) based on lies. He said that Defendant did tell him about the Humboldt case [i.e., concerning victim Walsh], but not about the Mendocino case."

The court held a hearing on this new information. Detective Gourley testified that Marolla also called him in March 1990. Marolla had run afoul of the law in Oregon, and the authorities there sought a urine test. Marolla was afraid such a test would reveal his marijuana use, and he asked Detective Gourley to set up a meeting with the trial judge in Oregon. (Consistent with his past modus operandi, Marolla sought a deal with Oregon authorities in which he would reveal information he allegedly knew about a drug lab in the Bay Area in exchange for a reduced charge.) When Detective Gourley was unable to obtain such special treatment from Oregon authorities, Marolla told him "that if he didn't get the meeting with the judge that he wanted, he was going to send a letter that he had had prepared by an attorney . . . stating that he had lied at [defendant's] trial." According to Gourley, Marolla was very upset and Gourley hung up on him. Marolla called back five minutes later, and "[h]e was calmed down. He apologized. He said that he would never do anything like that." Detective Gourley testified he did not provide Marolla with any information about defendant's case. The other officers who also interviewed Marolla in defendant's case similarly denied providing him information.

Marolla was called to the stand but claimed his right to silence under the Fifth Amendment to the United States Constitution. But when he was asked

(referring to defendant's trial), "did you in fact give testimony which was untrue," he replied: "*No*. I claim the [Fifth]." (Italics added.) Marolla refused to answer any additional questions, but the trial court denied defendant's motion to exclude this one negative answer. No evidence was presented suggesting Marolla was terminally ill.

The trial court denied the new trial motion, explaining: "There is no contention that defendant did not recite to Marolla concerning [Walsh's case] as Marolla testified at trial. As to the details of [A.L.'s case, she] testified and *identified defendant and graphically detailed those events.* [¶] I am unable to determine Marolla's motivations in the March 1990 contacts other than to assume he was attempting to better his position. He has denied untruthfulness in this proceeding."

Defendant contends that this evidence strongly suggests Marolla lied at his trial. We disagree. Instead, it appears Marolla was merely threatening to recant his testimony so as to obtain favorable treatment in Oregon. Shortly thereafter, Marolla himself reassured Gourley that he would "never" recant his testimony in defendant's case. The trial court so held, and its credibility determinations in this matter are entitled to deference on appeal.[4]

Despite serious questions surrounding Marolla's credibility, his account of defendant's admissions to him included many details that interlocked with facts about the crimes against Walsh and A.L. that were known from other sources. Not only did Marolla know the basic facts of the crimes against Walsh, such as where she was from, where her body was found, and that she had been strangled and thrown from a bridge in Rio Dell, he also knew more subtle facts, such as that the murder occurred around 4:00 a.m., that defendant continued driving northward to work after the killing, and that the victim had voided her bladder when strangled. While it is of course within the realm of possibility that Marolla learned these facts from a source other than defendant, the jury no doubt considered that possibility, as defense counsel explicitly raised the idea that Marolla had obtained his information about the Walsh rape and murder by reading the newspaper. Under the circumstances, we reject defendant's contentions that Marolla's testimony was so inherently incredible or demonstrably false, or that informant testimony in general is so unreliable, that the trial court abused its discretion in admitting it.

Taking a slightly different tack, defendant next argues the trial court should have excluded Marolla's testimony because counsel was unable to effectively

---

[4] To the extent defendant also contends the trial court erred by denying his new trial motion, we reject that claim as well, there being no apparent manifest and unmistakable abuse of discretion. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1252 [74 Cal.Rptr.2d 212, 954 P.2d 475].)

cross-examine him. The basis of this claim requires some background. When defendant was in pretrial custody for his crimes against A.L., he met Marolla and made his first set of damaging admissions. Marolla thereafter contacted law enforcement through his attorney and on February 23, 1985, spoke to Detective Gourley about defendant's admissions. At that meeting, it was decided Marolla should wear a secret recording device (a "wire") in the hope that defendant would incriminate himself on tape. Marolla was instructed not to ask any questions but merely serve as a listening post. Later that same day, police monitored and recorded defendant's statements to Marolla. On March 1, 1985, defendant agreed to give Marolla a written statement of his involvement in the crimes against Walsh and A.L., ostensibly as collateral for his promise to pay for the contract killing of A.L. to prevent her from testifying against him.[5]

Defendant moved to exclude his tape-recorded February 23 statements as well as his March 1 written statement, citing Fifth and Sixth Amendment grounds. The trial court initially denied the motion but later reconsidered and excluded the statements. Still admissible, however, were Marolla's recollection of a prior conversation he had had with defendant about the A.L. and Walsh crimes and his statements to Detective Gourley on February 23. Given this state of affairs, it became defense counsel's strategy to undermine Marolla's credibility by highlighting the inconsistencies between his prior statements to Detective Gourley (which were rather shorn of detail) and his trial testimony (which was more extensive). The parties, of course, could not, before the jury, refer to the recorded or written statements that had been excluded. Marolla was explicitly instructed not to mention the excluded information.[6]

Marolla nevertheless proved a clever and dexterous witness. After defense counsel's initial efforts at cross-examination produced some vague and nonresponsive answers, defense counsel approached the bench and objected: "I'll move for a mistrial now and I think perhaps my request would be that if the Court denies that to take a break and have Mr. Marolla admonished as to what his responsibilities are at this time. Because I'm cross-examining [him and] . . . he's answering in nonresponsive ways and is putting out information he knows is not admissible. [¶] I would request, for the protection of the

---

[5] Evidence of this plan to kill A.L., and defendant's guilty plea to soliciting Marolla to murder her, were excluded from the trial.

[6] Thus, the prosecutor stated: "I have spoken with [Marolla] this morning, and in accordance with the Court's prior directive, have advised him that he is not to mention anything about [the charges against defendant for soliciting A.L.'s murder]. He is not to discuss or mention the fact that he was wired. He is not to discuss or mention any statement or information he received from Mr. Hovarter after he was wired, whether it be verbal or written. . . . He is to refer to the conversation which he has or had with Mr. Hovarter about the Walsh case as 'the conversation.' " The trial court also admonished Marolla.

record, I make the motion for mistrial now and that he be admonished because I have to be able to cross-examine him about how many conversations he had with the police without bringing up whether or not he had other conversations with . . . Mr. Hovarter. [¶] He's just dying to let the cat out of the bag. And it's a problem." The court denied the mistrial motion.

Defendant contends he could not effectively cross-examine Marolla because Marolla "repeatedly referred to more than one conversation and refused to confine his answers to the pre-wiring statements despite counsel's best efforts." While Marolla was certainly a difficult witness, we disagree defense counsel was unable to conduct an effective cross-examination. Immediately following the court's denial of the mistrial motion, defense counsel asked Marolla a series of direct questions, which elicited from him that he told Detective Gourley he did not know whether a rope was left on Walsh's body or whether she had been raped, and that it was "possible" he told Gourley that defendant characterized Walsh as an older woman. This differed from his testimony on direct examination when he testified defendant had told him he left the rope on the body, that he twice raped Walsh, and that defendant inconsistently referred to Walsh, once saying she was younger than A.L., another time saying she was older. Counsel also had Marolla frankly admit he traded the information about defendant for his own freedom. Under the circumstances, we cannot agree that defense counsel was unable to effectively cross-examine Marolla.

Finally, defendant argues that permitting him to be convicted of capital murder based on the unreliable testimony of a witness like Gary Marolla violates his Eighth Amendment right to heightened standards of reliability in capital cases. (See *In re Sakarias* (2005) 35 Cal.4th 140, 160 [25 Cal.Rptr.3d 265, 106 P.3d 931]; *People v. Yeoman* (2003) 31 Cal.4th 93, 141 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) But defendant was not convicted solely on Marolla's testimony. Marolla's evidence, though perhaps flawed by his credibility problems, was bolstered by A.L.'s evidence, the forensic evidence, and Louisiana-Pacific's logsheets. Accordingly, the reliability of the evidence supporting defendant's conviction was sufficient to satisfy the Eighth Amendment to the United States Constitution.

### 2. *Defendant's Crimes Against A.L.*

Defendant moved before trial to exclude evidence of his convictions for forcibly raping, kidnapping, and attempting to murder A.L., and his plea to soliciting her murder. In support, he claimed this evidence was more prejudicial than probative, citing Evidence Code section 352; was unduly prejudicial and not otherwise admissible for impeachment, citing *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]; and was not admissible

under Evidence Code section 1101 because the crimes against A.L. were not sufficiently similar to those against Walsh. The trial court granted in part and denied in part defendant's motion, ruling (1) the convictions for rape, kidnapping, and attempted murder were admissible on the question of identity; and (2) the conviction for soliciting A.L.'s murder was not admissible on any theory.

A.L. subsequently testified against defendant. Following the close of the prosecution's evidence, defendant moved for a new trial (§ 1181), citing the allegedly erroneous and prejudicial admission of A.L.'s testimony, but the trial court denied the motion. Defendant now renews his challenge to the admission of evidence of his crimes against A.L.

█ As a historical matter, evidence tending to reveal a person's propensity or inclination to commit a crime was deemed inadmissible not because it was irrelevant but because it was considered too prejudicial. Noting Chief Justice Benjamin Cardozo's comment, however, that the effect of this rule is that "[i]n a very real sense a defendant starts his life afresh when he stands before a jury, a prisoner at the bar" (*People v. Zackowitz* (1930) 254 N.Y. 192, 197 [172 N.E. 466]), our former colleague Justice Otto Kaus once remarked that "[r]easonable persons may fret over the wisdom of permitting an incorrigible scoundrel to 'start his life afresh' when charged with the umpteenth repetition of some particular offense" (*People v. Wills-Watkins* (1979) 99 Cal.App.3d 451, 457 [160 Cal.Rptr. 289] (conc. opn. of Kaus, P. J.), fn. omitted). In any event, the rules governing this point of law are now well settled.[7] " 'Evidence Code section 1101, subdivision (b) provides in pertinent part that evidence of other crimes is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than [the defendant's] disposition to commit such an act." " 'Evidence of the defendant's commission of a crime other than one for which the defendant is then being tried is not admissible to show bad character or predisposition to criminality but it may be admitted to prove some material fact at issue, such as motive or identity. (Evid. Code, § 1101.) Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. [Citation.]' [Citation.] In cases in which [a party] seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses, admissibility 'depends upon proof that the charged and uncharged offenses *share distinctive common marks sufficient to raise an inference of identity.*' " [Citation.] "A somewhat lesser degree of similarity is required to show a common plan or scheme and still less

---

[7] Defendant's trial in 1987 occurred well before the enactment of Evidence Code section 1108, which loosened the restrictions on the admissibility of other-crimes evidence in cases involving sex crimes.

similarity is required to show intent. (*People v. Ewoldt* [(1994)] 7 Cal.4th [380,] 402–403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) On appeal, we review a trial court's ruling under Evidence Code section 1101 for abuse of discretion." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 500 [61 Cal.Rptr.3d 526, 161 P.3d 58], italics added.)

■ Proper resolution of the issue turns on the relative distinctiveness of the common features between the two sets of crimes. To establish the identity of the perpetrator of the crimes against Walsh, the A.L. crimes and the Walsh crimes " 'must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." ' (*People v. Ewoldt, supra*, 7 Cal.4th at p. 403.) 'The highly unusual and distinctive nature of both the charged and [prior] offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense.' (*People v. Balcom* (1994) 7 Cal.4th 414, 425 [27 Cal.Rptr.2d 666, 867 P.2d 777].)" (*People v. Gray* (2005) 37 Cal.4th 168, 203 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

The prosecution in this case proffered 16 different points of similarity between the A.L. and Walsh crimes. The trial court did not accept the argument that all 16 points were of equal import, noting that many of the points of alleged similarity "are common to the classes of crime charged." Nevertheless, the court found many factors relatively unique, thereby suggesting the same person committed both sets of crimes:

"First, the focus upon the corridor of U.S. Highway 101, the gathering of a victim encountered by chance and alone upon U.S. Highway 101.

"Second, the transportation of the victim over long distances.

"Third, the use of defendant's distinctive truck with sleeping compartment[,] his work place, as the locus of rape and transport.

"Fourth, strangulation (Walsh), intended strangulation ([A.L.]) and a concerted effort to dispose [of] the body in a stream of running water.

"The remaining suggested marks, perhaps common to similar class[es] of crime, add to the composite 'if considered together.' "

Although the trial court did not explain this final comment, we assume the "remaining suggested marks" include that the victims were both young women in their late teens, were both taken to another county, were both

raped, neither was severely beaten or suffered traumatic injury to her genital area, both were fully dressed when released, and both were left for dead.

Reviewing the trial court's decision to admit or exclude the evidence under Evidence Code section 1101 by applying the abuse of discretion standard, as we must (*People v. Abilez, supra*, 41 Cal.4th at p. 500), we conclude the trial court acted well within its discretion. Most distinctive facts common to both sets of crimes are that both involved abduction, rape, and murder (or attempted murder); both involved teenage girls (Walsh was 16 years old, A.L. was 15); both occurred along Highway 101 under circumstances suggesting the young women were taken from along the highway; both occurred in roughly the same timeframe (Walsh was raped and killed in August 1984, the crimes against A.L. occurred in December of the same year); and both victims were moved a substantial distance.[8] The perpetrator of both crimes sought to dispose of the victim's body in a running body of water: Walsh was dropped off the Scotia/Rio Dell Bridge near the Eel River; A.L. was rolled into the Russian River.

This is not to say the trial court's ruling was unassailable. The court relied on the fact both young women were sexually assaulted in the sleeping compartment of defendant's truck, but although the evidence that A.L. was assaulted there was strong, only speculation suggests that Walsh was raped there. Moreover, Walsh was strangled but A.L. was shot. Nonetheless, these facts do not compel the conclusion the trial court abused its discretion, especially when we consider the "remaining suggested marks," set out above. Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [40 Cal.Rptr.3d 118, 129 P.3d 321].) As in *People v. Medina* (1995) 11 Cal.4th 694 [47 Cal.Rptr.2d 165, 906 P.2d 2], "we think that, *in the aggregate*, the similarities become more meaningful, leading to the reasonable inference that defendant was the person who committed all [the] crimes." (*Id.* at p. 748, italics added.) None of the cases on which defendant relies compel a different result, for they are all distinguishable on their facts. (E.g., *People v. Gallego* (1990) 52 Cal.3d 115 [276 Cal.Rptr. 679, 802 P.2d 169] [prior crimes admissible for intent and motive, not identity]; *People v. Guerrero* (1976) 16 Cal.3d 719, 727 [129 Cal.Rptr. 166, 548 P.2d 366] [error to admit prior rape in murder case; evidence later murder victim was raped was inconclusive]; *People v. Nottingham* (1985) 172 Cal.App.3d 484 [221 Cal.Rptr. 1] [same]; *People v. Alvarez* (1975) 44 Cal.App.3d 375 [118 Cal.Rptr. 602] [prior crime substantially different].)

---

[8] Walsh's body was found 110 miles from her last known location in Willits. A.L. was transported more than 169 miles, from Fields Landing, near Fortuna, to the Russian River area.

Defendant also argues the trial court erred by denying his motion to exclude A.L.'s evidence on the ground it was more prejudicial than probative. (Evid. Code, § 352.) As with the court's Evidence Code section 1101 ruling, we evaluate its ruling under Evidence Code section 352 applying the abuse of discretion standard. (*People v. Cox* (2003) 30 Cal.4th 916, 955 [135 Cal.Rptr.2d 272, 70 P.3d 277].) On these facts, we cannot conclude the court abused its discretion. It carefully excluded evidence of defendant's rape, kidnapping, and attempt to murder A.L. on the issues of motive and common plan, correctly deciding that neither issue was truly disputed by the parties. It also excluded evidence that, when he was in pretrial custody, defendant solicited Marolla to murder A.L. to eliminate her as a witness—a crime to which defendant pleaded guilty—finding that such evidence was "not relevant, is prejudicial and outweighs any probative value." It also rejected the prosecution's proffered theory that the evidence was admissible to elucidate the nature of the relationship between defendant and Marolla. We cannot say the evidence that remained—evidence of rape, kidnapping, and attempted murder used to prove identity—was more prejudicial than probative.

■ Defendant further argues "there was a high degree of danger" the jury chose to convict him in order to punish him for his crimes against A.L. This is rank speculation and is belied by the jury instructions that both prohibited the jury from considering the issue of penalty or punishment in its deliberations and informed it that the evidence of defendant's crimes against A.L., as well as his convictions for those crimes, was admissible for only the limited purpose of showing the identity of the person who raped and killed Danna Walsh.[9] Although defendant contends the limiting instructions were "not sufficient to properly guide the jury's consideration of the other crime evidence," he does not persuasively explain why. "We presume that jurors understand and follow the court's instructions" (*People v. Gray, supra,* 37 Cal.4th at p. 231) and thus reject the claim the court abused its discretion under Evidence Code section 352.

---

[9] The jury was instructed with CALJIC No. 2.50, which in pertinent part states that "[e]vidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show a characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which will further tend to show the identity of the person who committed the crime, if any, of which the defendant is accused." We previously have found this instruction correctly states the law and have rejected the argument that it is "confusing and contradictory." (*People v. Wilson* (2005) 36 Cal.4th 309, 328 [30 Cal.Rptr.3d 513, 114 P.3d 758].)

### 3. *Defendant's Statements to A.L.*

Both A.L. and Detective Pintane provided evidence of defendant's statements that linked his crimes against A.L. to those of Walsh. A.L. recounted for the jury statements defendant had made to her that could have suggested he previously kidnapped and raped another young woman. Pintane testified that when he interviewed A.L. shortly after the crimes against her, A.L. told him that defendant had told her this was not the first time he had committed such crimes. Although defendant challenges the admission of this evidence on several grounds, we find no error.

Before trial, it appears the parties assumed A.L. would testify that defendant had said both that he knew what he was doing and that he had committed a similar crime in the past. Defendant moved before trial to exclude all evidence of his crimes against A.L. under Evidence Code sections 1101 (discussed in pt. I.B.2., *ante*) and 352, as well as on other grounds not relevant here. In opposing the motion, the People in their brief specifically noted that when Detective Pintane interviewed A.L., she told him that defendant had told her it "wasn't the first time he had done this." Notwithstanding that defendant did not make a hearsay argument, the trial court in denying the pretrial motion concluded in part that evidence of defendant's statements was admissible "as an admission by the defendant," an apparent reference to an exception to the hearsay rule (see Evid. Code, § 1220). The trial court's ruling made no mention of any testimony Detective Pintane might give.

At trial, A.L. described for the jury her recollections of the ordeal of being kidnapped, bound, raped, twice shot in the head, and left for dead floating in the Russian River. During her testimony, the prosecutor asked her about certain statements defendant had made:

"Q. Did the defendant ever tell you that he had done this sort of thing before.

"A. Yes. He told me that he knew what he was doing."

Defense counsel did not object.

On cross-examination, defense counsel followed up on the point:

"Q. Do you remember him saying anything more than he said that he knew what he was doing.

"A. No.

"Q. That's what you testified to; correct?

"A. Yes.

"Q. Did you know if that had to do with he knew what he was doing in terms of raping you.

"A. *That's the idea that I got.*" (Italics added.)

Later on redirect examination, the prosecutor asked A.L. whether defendant had actually said that he previously committed a similar crime:

"Q. Did you tell Detective Pintane that the man who had done these things to you told you that this was not the first time that he had done this and that he knew what to do?

"A. He said that he knew what he was doing. I remember that. *I don't remember if he said specifically that he had done it before.*" (Italics added.)

The People then called Detective Pintane to the stand. The prosecutor asked him whether A.L. had told him "that her assailant had told her that this wasn't the first time that he had done this and that he knew what to do?" The court overruled defense counsel's objection that the question had been asked and answered. Pintane then affirmed that when he interviewed A.L., she told him "her assailant said to her that *this was not the first time that he had done this* and that he knew what to do." (Italics added.)

Defendant suggests the admission of A.L.'s testimony recounting his statements violated the hearsay rule, an objection he made neither pretrial nor at trial. His failure to object at trial on this ground provides a substantial basis for concluding that the issue was not preserved for appeal. However, because the trial court's pretrial ruling denying the motion to exclude the evidence of his crimes against A.L. specifically referenced the hearsay rule, defendant may have reasonably believed advancing a hearsay objection at trial would have been futile. Under the circumstances, we will assume the issue of whether the hearsay rule applies to A.L.'s testimony concerning defendant's statements is properly before us.

Turning to the merits, we find no error because A.L.'s testimony was admissible as describing statements by a party, as the trial court ruled. "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." (Evid. Code, § 1220.) On appeal, "an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of

evidence, including one that turns on the hearsay nature of the evidence in question . . . ." (*People v. Waidla* (2000) 22 Cal.4th 690, 725 [94 Cal.Rptr.2d 396, 996 P.2d 46]; see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1144 [63 Cal.Rptr.3d 297, 163 P.3d 4].) Applying this standard here, we conclude the trial court did not abuse its discretion by admitting the evidence of defendant's comment.

Defendant also contends Detective Pintane's testimony (that A.L. told him defendant said he had done this before) should have been excluded as hearsay. Defendant did not raise the issue of Pintane's evidence in his pretrial motion to exclude evidence of defendant's crimes against A.L. At trial, defendant failed to raise a hearsay objection as well but objected on a different ground ("asked and answered"). Accordingly, defendant failed to preserve this issue for appeal by making a timely and specific hearsay objection. (Evid. Code, § 353.)

█ Were we to assume nevertheless that defendant preserved the hearsay issue with respect to Detective Pintane's testimony, we would conclude the court did not abuse its discretion by admitting the testimony because it fell within the prior inconsistent statement exception to the hearsay rule. (Evid. Code, § 1235.) Detective Pintane's police report clearly indicates A.L. told him she saw defendant obliterating his shoe prints from the trail to the Russian River, and at that time defendant told her this "wasn't the first time he had done this and that he knew what to do." When she testified at trial that she did not "remember if he said specifically that he had done it before," a question arose whether her proclaimed lack of memory was a deliberate evasion, which could give rise to an implied inconsistency (*People v. Ervin* (2000) 22 Cal.4th 48, 84–85 [91 Cal.Rptr.2d 623, 990 P.2d 506]), or a true case of a failed memory. Of course, dealing with a sexual assault victim's memory of the traumatic event can be a delicate matter and one committed to the trial court's discretion. But because defendant did not make a timely hearsay objection, the court was never obliged to consider this point. In any event, Detective Pintane's testimony recounting A.L.'s prior statement was sufficiently inconsistent *in effect* to qualify as a prior inconsistent statement. (*People v. Fierro* (1991) 1 Cal.4th 173, 221–222 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) "Generally it is true that the testimony of a witness indicating that he or she does not remember an event is not inconsistent with a prior statement describing the event. [Citation.] 'But justice will not be promoted by a ritualistic invocation of this rule of evidence. Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement [citation], and the same principle governs the case of the forgetful

witness.' " (*Id.* at p. 221.) We thus conclude the evidence was not rendered inadmissible by the hearsay rule.[10]

The hearsay rule aside, it appears that the main thrust of defendant's objections to this evidence, either from A.L., Detective Pintane, or both, is that defendant's statements that he knew what he was doing and it was not his first time were too speculative and vague to support the inference that he had previously committed a similar set of crimes. In support, defendant cites *People v. Allen* (1976) 65 Cal.App.3d 426, 433 [135 Cal.Rptr. 276], which explained that "for . . . a statement to be admissible against a party as an admission, the statement must assert facts which would have a tendency in reason either (1) to prove some portion of the proponent's cause of action, or (2) to rebut some portion of the party declarant's defense." (See *People v. Kraft* (2000) 23 Cal.4th 978, 1035 [99 Cal.Rptr.2d 1, 5 P.3d 68] [describing *Allen* as a case that "involved a statement, clear on its face, to which the prosecution sought to ascribe a different, inculpatory meaning not directly inferable therefrom"].) "Speculative inferences that are derived from a declarant's words cannot be deemed to be relevant under the definition of relevant evidence set forth in Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a 'tendency in reason' for such purpose." (*Allen*, at p. 434.)

Although defendant's comments were somewhat vague, the trial court was within its discretion in concluding that they permitted the inference he had committed a similar crime in the past. Certainly A.L. had a definite impression as to the meaning of the comment, and she was a percipient witness to the circumstances of its utterance. The jurors were thus provided with both her account of the statement having been made and her assessment of its meaning at the time.[11] Under such circumstances, the trial court's decision to admit the evidence was not "arbitrary, capricious, or patently absurd" such that it "resulted in a manifest miscarriage of justice." (*People v. Guerra, supra,* 37 Cal.4th at p. 1113.)

Stating the same basic argument in different terms, defendant contends A.L.'s testimony on this point should have been excluded as irrelevant. (Evid. Code, § 210.) We disagree. Because defendant's comment to A.L. that

---

[10] Because Pintane's testimony was thus admissible under Evidence Code section 1235, we need not decide whether it was also admissible as a prior recollection recorded under Evidence Code section 1237.

[11] Defendant also relies on *People v. Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203] for the proposition that "the determination of whether there is sufficient evidence to support an inference is a question of law, to be determined by the trial judge, and not the jury." *Hannon* is inapposite; we assume the trial court assessed whether defendant's admission could support the inference that he had committed a prior and similar crime. There is no suggestion the court abdicated its judicial role and left that assessment to the jury.

he knew what he was doing suggested he had raped and killed before, it was relevant and thus admissible to show his state of mind. (See *People v. Gurule* (2002) 28 Cal.4th 557, 652 [123 Cal.Rptr.2d 345, 51 P.3d 224] [defendant's statement that he had "killed before" admissible to show his state of mind in forming the plan to commit the crimes].) Its weight was for the jury to determine.

■ We also reject defendant's claim that admission of A.L.'s and Detective Pintane's testimony violated his constitutional rights to due process, a fair trial, and a reliable penalty determination under various federal and state constitutional provisions. The "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." (*People v. Brown* (2003) 31 Cal.4th 518, 545 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) As defendant provides no elaboration or separate argument for these constitutional claims, we decline to address further these boilerplate contentions. (*Id.* at p. 538, fn. 6.)

### 4. *Louisiana-Pacific Logsheets*

Witnesses testified that whenever a truck entered the front entrance of the Louisiana-Pacific pulp mill, a guard at the gate entered the driver's name and either the vehicle registration or license plate number of his truck in a log. Over objection, the prosecution introduced some of these logs (hereafter logsheets). One logsheet indicated the time defendant arrived at and departed the mill on the day A.L. was attacked. Other logsheets showed that on the day Walsh was attacked, defendant arrived at the mill later than usual and thus, inferentially, had time to commit the offenses against Walsh. The prosecution relied on the logsheets as circumstantial evidence showing defendant was likely in the general geographical area when both Walsh (near Willits) and A.L. (near Fortuna) were abducted and thus had the opportunity to commit the crimes. Defendant raises a multipronged attack on the admission of the logsheets based on two general theories. First, he contends the logsheets fail to qualify for admission under the business records exception to the hearsay rule. Second, he argues the logsheets were inadmissible under the best evidence rule. As we explain, these arguments lack merit.

### a. *Business records exception*

Evidence Code section 1271 provides that "[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its

preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Although defendant apparently concedes the evidence satisfied the first three requirements of the business records exception, he contends the logsheets did not qualify for admission under the fourth requirement: trustworthiness. The prosecution, as the party offering the evidence, bore the burden of establishing the foundational requirement of trustworthiness. (*People v. Beeler* (1995) 9 Cal.4th 953, 978 [39 Cal.Rptr.2d 607, 891 P.2d 153].) A trial court has broad discretion in determining whether a sufficient foundation has been laid to qualify evidence as a business record. On appeal, we will reverse a trial court's ruling on such a foundational question only if the court clearly abused its discretion. (*Ibid.*)[12]

■ Defendant argues the logsheets were untrustworthy because they omitted the names of some truckers who had entered and departed the pulp mill. But that a business record contains some omissions does not necessarily render unreliable the information the record includes. (See *People v. Diaz* (1992) 3 Cal.4th 495, 535 [11 Cal.Rptr.2d 353, 834 P.2d 1171] [medical records].)

The prosecution presented testimony from Louisiana-Pacific employees familiar with the pulp mill's standard operating procedures for the front gate. Their testimony established that, despite some errors, it was very unlikely a driver's name and truck identifying information would be logged in had the driver not in fact appeared at the front gate. Significantly, defendant presented no evidence showing the information recorded in the relevant logsheets was inaccurate, only that the logsheets were incomplete.

Defendant next argues the logsheets were untrustworthy because of the pulp mill's policy of having trucks that entered through the back gate proceed to the front gate to be logged in. Jack Davis, shipping foreman for the pulp mill, testified the pulp mill had only one legitimate entry—the front gate—and it was at this gate the guard logged in the names of the drivers and the trucks' identifying information. But the mill's policy of requiring trucks entering through the back gate to go to the front gate to log in does not make

---

[12] The trial court did not make an express ruling as to trustworthiness. Instead, it ruled that evidence presented by Harlan Smith, an employee of Louisiana-Pacific, met the requirements of Evidence Code section 1271 and that the logsheets "will be admissible." This was sufficient: A ruling admitting a writing pursuant to the business records hearsay exception is considered an implied finding by the trial court that the conditions of the trustworthiness requirement have been met. (Evid. Code, § 402, subd. (c) ["A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto . . . ."]; *Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 784 [142 Cal.Rptr. 1] [court need not make express finding as to trustworthiness under business records exception].)

the front gate logsheets inaccurate as to the time that *a truck entered the front gate*. Significantly, defendant presented no evidence he tried to enter the mill through the back gate on the dates in question.

Defendant next argues the logsheets were untrustworthy because the names of truckdrivers and their times of entry into and departure from the mill were not placed uniformly in the same columns or locations on the logsheets. But there was no showing that the logsheet entries' relative lack of orderliness rendered the information contained therein unreliable. (Cf. *Arques v. National Superior Co.* (1945) 67 Cal.App.2d 763, 777 [155 P.2d 643] [stating, under a predecessor statute to the business records exception: "This is not the best method of bookkeeping but no item has been called to our attention that suggests a definite inaccuracy."].)

■ Finally, defendant argues the logsheets were untrustworthy because the notation of defendant's entry on December 11, 1984—the date of the A.L. offenses—was made by someone other than Harlan Smith, the gatekeeper on duty. We reject the argument. Harlan Smith testified he was on the phone at the time defendant entered the mill on that date and, recognizing defendant (with whom the company had a long-standing work relationship) and his truck, he directed his supervisor, Joe Watson, to make the log entry. Many business records are prepared through the activities of several persons, and one employee may report facts he or she knows to a second employee, who then records those facts in the regular course of business. (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1997) § 4.9, p. 121.) So long as "the person who originally feeds the information into the process [has] firsthand knowledge," the evidence can still qualify as a business record. (2 McCormick on Evidence (6th ed. 2006) p. 314.) In this case, Smith's testimony explained the handwriting discrepancy and verified that the notation was made at his direction by another employee during the regular course of business.

In sum, the trial court did not abuse its discretion in finding the prosecution had satisfied its burden of showing the logsheets were sufficiently trustworthy to qualify as business records under Evidence Code section 1271, subdivision (d).

### b. *Best evidence rule*

■ Defendant contends admission of the logsheets violated the best evidence rule because the sheets were photocopies of the original documents. At the time of defendant's trial, the best evidence rule provided that "no evidence other than the original of a writing is admissible to prove the content of a writing." (Evid. Code, former § 1500, as amended by Stats. 1977,

ch. 708, § 3, p. 2269 and repealed by Stats. 1998, ch. 100.)[13] The purpose of the rule was " 'to minimize the possibilities of misinterpretation of writings by requiring the production of the original writings themselves, if available.' " (*People v. Panah* (2005) 35 Cal.4th 395, 475 [25 Cal.Rptr.3d 672, 107 P.3d 790].) ■ "[A] photocopy of an original document is admissible under several of the broad exceptions to the [best evidence] rule: Evidence Code [former] section 1501 provides that a copy is not inadmissible if the writing is lost or destroyed without fraudulent intent; [former] section 1502 provides a copy is not inadmissible if the writing could not be procured by the court's process 'or other available means'; and [former] section 1511 provides that '[a] duplicate is admissible to the same extent as an original unless (a) a genuine question is raised as to the authenticity of the original or (b) in the circumstances it would be unfair to admit the duplicate in lieu of the original.' " (*Osswald v. Anderson* (1996) 49 Cal.App.4th 812, 819 [57 Cal.Rptr.2d 23].) Of course, the proponent of the evidence bears the burden of showing one of the exceptions to the rule applies. (*People v. Woodell* (1998) 17 Cal.4th 448, 465 [71 Cal.Rptr.2d 241, 950 P.2d 85].)

■ Defendant maintains the prosecution failed to carry its burden of proving a reasonable search had been conducted for the original logsheets or that they were truly lost. "The best evidence rule mandates that in order to present secondary evidence of the contents of the original written instrument, evidence of its loss, destruction, or unavailability must be presented." (*Von Brimer v. Whirlpool Corporation* (N.D.Cal. 1973) 362 F.Supp. 1182, 1187, citing Evid. Code, former §§ 1500–1501.) Defendant claims the record contains only conclusory statements the original logsheets were unavailable, and the prosecution presented no evidence suggesting it had conducted a diligent search for the originals.

■ We disagree. As we explained in *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059 [124 Cal.Rptr.2d 142, 52 P.3d 79], addressing the current version of the secondary evidence rule: " ' "If any suspicion hangs over the instrument, or that it is designedly withheld, a rigid inquiry should be made into the reasons for its non-production. *But where there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original—in fact, courts in such cases are extremely liberal.*" ' [Citation.] Questions whether the search was sufficient in scope and was conducted in good faith are addressed to the discretion of the trial court, and will not be disturbed on appeal absent abuse of discretion." (*Id.* at p. 1069, italics added.)

---

[13] The best evidence rule has been renumbered and retitled, and is now called the secondary evidence rule. (See now Evid. Code, § 1521.) We consider the rule as it existed at the time of defendant's trial.

Nothing in this case suggests the original logsheets were intentionally withheld or destroyed. Frank Wigginton, the director of security for the Western Division of Louisiana-Pacific, testified that he was responsible for maintaining the front gate records and that he maintained these and other security records for six months, after which time they were destroyed in the normal course of business. This case is thus unlike *Osswald v. Anderson, supra,* 49 Cal.App.4th at page 819, on which defendant relies, because in that case the proponent of the evidence (a purported duplicate of a deed) failed to present any evidence the original deed was actually lost or that he had searched for it in any of the places one would have thought it could be found. Here, by contrast, the trial court was entitled to rely on Wigginton's testimony and conclude the prosecution had satisfied its burden of showing that the logsheets had in fact been destroyed, that their destruction had been without fraudulent intent in the regular course of business, and that therefore the duplicates were admissible under Evidence Code former section 1501.

 Defendant also argues the trial court erred in admitting the duplicate logsheets because they contained handwritten sequential numbering and other markings which, according to some witnesses, did not exist on the original logsheets. Evidence Code section 1402 provides "[t]he party producing a writing as genuine which has been altered, or appears to have been altered, after its execution, *in a part material to the question in dispute,* must account for the alteration or appearance thereof." (Italics added.) Defendant does not claim the "sequential numbering and other markings" were material to the question in dispute, i.e., the time of day he entered the pulp mill on August 24, 1984, the day of Walsh's murder, and the two days prior, nor does it appear these markings would have any effect on the reliability or accuracy of that information. Therefore, Evidence Code section 1402 did not require the prosecution to explain this alteration. The trial court acted within its discretion in finding the logsheets had been properly authenticated.

We conclude the trial court, by admitting duplicates of the logsheets from the Louisiana-Pacific pulp mill, did not abuse its discretion under the best evidence rule.

To the extent defendant contends the admission of the Louisiana-Pacific logsheets violates his federal constitutional right to due process of law or to confront the witnesses against him, we reject that claim as well. The "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." (*People v. Brown, supra,* 31 Cal.4th at p. 545.)

### 5. *Challenges to the Sufficiency of the Evidence*

Defendant next contends that none of his three felony convictions is supported by substantial evidence. The law is settled. " 'In reviewing a

criminal conviction challenged as lacking evidentiary support, " 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754].)' (*People v. Combs* (2004) 34 Cal.4th 821, 849 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)' (*Combs*, at p. 849.)" (*People v. Halvorsen, supra*, 42 Cal.4th at p. 419.)

### a. *Rape*

■ "Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator against the person's will by means of force or violence." (*People v. Guerra, supra*, 37 Cal.4th at p. 1130.) Here, there is no question regarding force: Walsh was found dead by strangulation, her body thrown off the Scotia/Rio Dell Bridge, and evidence suggested she had been bound. Nor is there any question of penetration: semen was found in her vagina. Finally, there is of course no evidence defendant was married to Walsh. The remaining questions are whether the penetration was forcible and whether defendant was the perpetrator.

Defendant emphasizes evidence that Dennis Haun, Walsh's boyfriend, may have had sex with her earlier that night, that the PGM/secretor evidence could not definitively eliminate Haun as the donor of the semen found in her vagina, that Walsh's clothing was not ripped or torn, and that her genital region suffered no traumatic injury. Defendant cites several cases in which this court found evidence of rape or forcible sex crimes insufficient. (See, e.g., *People v. Johnson* (1993) 6 Cal.4th 1 [23 Cal.Rptr.2d 593, 859 P.2d 673], overruled on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879 [48 Cal.Rptr.3d 1, 141 P.3d 135]; *People v. Raley* (1992) 2 Cal.4th 870 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Craig* (1957) 49 Cal.2d 313 [316 P.2d 947].)

We need not parse the facts of those cases nor compare and contrast their facts to the facts of this case for, as respondent cogently observes, this is not a case in which the jury was faced with equivocal evidence of a deceased, partially dressed female victim bearing the traces of having suffered some physical brutality. The evidence in this case was much more direct. Thus, during the prosecutor's questioning of Gary Marolla, the following occurred:

"[THE PROSECUTOR]: Q. Mr. Marolla, did the defendant tell you whether or not he had raped the girl he killed and dumped in Rio Dell?

"[WITNESS MAROLLA]: A. Yes. He did.

"Q. What did he tell you about that?

"A. *He told me he raped her twice.*" (Italics added.)

The jury was not required to accept Marolla's testimony, and as we explained *ante*, reasons existed to question his veracity. But we cannot say the jury was required to disbelieve him either. " ' "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Lewis* (2001) 26 Cal.4th 334, 361 [110 Cal.Rptr.2d 272, 28 P.3d 34].) Moreover, in addition to Marolla's testimony, the jury had before it (1) the forensic evidence showing that defendant could not be *excluded* as the donor of the semen found in Walsh's vagina; (2) evidence from the Louisiana-Pacific logsheets showing he had the opportunity to commit the crime; and (3) defendant's commission of a similar set of crimes against A.L. a few months later. Viewing the evidence in a light most favorable to the judgment below (*People v. Halvorsen, supra,* 42 Cal.4th at p. 419), we find there was substantial evidence from which the jury could have concluded beyond a reasonable doubt that defendant forcibly raped Danna Walsh. We thus reject defendant's claim that his rape conviction was supported by insufficient evidence and also reject his associated claim that his rape conviction violated his state and federal constitutional rights to due process of law, a fair trial, and a reliable penalty determination. For the same reasons as explained above, we reject as well the claims that because they could have been based on a rape-felony-murder theory, we must reverse (1) the first degree murder verdict, (2) the rape-murder special-circumstance finding (§ 190.2, former subd. (a)(17)(iii), now subd. (a)(17)(C)), and (3) the death penalty.

### b. *Kidnapping*

At the time of the crimes, section 207, subdivision (a) provided: "Every person who forcibly steals, takes, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (Stats. 1982, ch. 1404, § 1, p. 5358.) Defendant argues there was insufficient evidence he kidnapped Walsh because there was no evidence he moved or asported her while she was still alive, and that if she was alive, there was "absolutely no evidence" the movement was anything other than voluntary. We disagree.

There is little dispute that Walsh was moved. She attended a party in Willits around 8:00 p.m. the night of August 23, 1984, along with several other people. A clerk at a convenience store in Willits believed she saw Walsh between midnight and 2:00 a.m. the morning of August 24th. Walsh's body was later found near the Scotia/Rio Dell Bridge around 1:00 p.m. that afternoon, about 110 miles from Willits.

Defendant suggests he may have raped and killed Walsh in Willits and then transported her dead body over 100 miles before he threw her off the Scotia/Rio Dell Bridge. Although this scenario is within the realm of the possible, Detective Gourley testified that Gary Marolla told him defendant admitted killing a girl " 'up in Rio Dell,' " suggesting defendant did not kill Walsh until he arrived in Scotia/Rio Dell. As before, the jury was not required to believe Marolla, but it was within its province to do so. Viewing the evidence in a light most favorable to the judgment, we conclude the jury most likely did believe this evidence.

Having found substantial evidence Walsh was alive when transported to her final resting place, we also reject defendant's argument that "absolutely no evidence" supports the conclusion her movement was involuntary. Defendant suggests he picked up Walsh as a hitchhiker; that she voluntarily agreed to accompany him in his truck to Scotia/Rio Dell; and that once there, he raped and killed her. But the evidence Walsh was raped, bound, beaten, and strangled raises a reasonable inference that she did not voluntarily accept a ride to Scotia/Rio Dell. Moreover, Walsh lived in Willits with her mother and sister and went to school there. The absence of any evidence Walsh had a possible reason to travel over 100 miles away to Scotia/Rio Dell in the middle of the night undercuts defendant's theory that she may have gone there voluntarily.

 Finally, although defendant argues Walsh may have entered defendant's truck willingly, this scenario does not necessarily negate the existence of a kidnapping. "Even if the victim's initial cooperation is obtained without force or the threat of force, kidnap[p]ing occurs *if the accused ' "subsequently restrains his victim's liberty by force* and compels the victim to accompany him further." ' [Citations.] 'The force used against the victim "need not be physical. The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances." ' " (*People v. Alcala* (1984) 36 Cal.3d 604, 622 [205 Cal.Rptr. 775, 685 P.2d 1126], italics added.)[14] Thus, even if Walsh had some reason, unknown to anyone else, for a trip to

---

[14] *Alcala* was abrogated by statute on another ground, as explained in *People v. Falsetta* (1999) 21 Cal.4th 903, 911 [89 Cal.Rptr.2d 847, 986 P.2d 182].

Scotia/Rio Dell in the wee hours of the morning and voluntarily accepted a ride from defendant, his subsequent decision to rape her and maintain his control of her in his truck vitiated any initial voluntariness, converting the encounter into one in which she was being transported against her will, that is, a kidnapping.

Viewing the evidence in a light most favorable to the judgment below (*People v. Halvorsen, supra,* 42 Cal.4th at p. 419), we conclude that Marolla's testimony suggesting Walsh was not killed until arriving at Scotia/Rio Dell, coupled with the evidence she had been raped, bound, beaten, and strangled and that she had no reason to travel to Scotia/Rio Dell in the middle of the night, constitutes substantial evidence from which the jury could have concluded beyond a reasonable doubt that defendant kidnapped Walsh. We thus reject defendant's claim his conviction for kidnapping was supported by insufficient evidence and also reject the associated claim that his kidnapping conviction violated his state and federal constitutional rights to due process of law, a fair trial, and a reliable penalty determination. For the same reasons, we reject the claims that because they could have been based on a kidnapping-felony-murder theory, we must reverse (1) the first degree murder verdict, (2) the kidnapping-murder special-circumstance finding (§ 190.2, former subd. (a)(17)(ii), now. subd. (a)(17)(B)), and (3) the death penalty.

c. *First degree murder*

The prosecution relied on two different legal theories of first degree murder: felony murder (rape, kidnapping), and premeditated and deliberate murder. Thus, the prosecutor argued: "Murder is [in] the first degree if it was committed during the commission of a crime such as rape, which is called felony murder, in which case the intent to commit the felony provides the malice[,] or if the murder is deliberate and premeditated. That is, the killer had the opportunity to weigh and consider the consequences of his act and made a conscious decision after that weighing process to kill." Defendant contends we must reverse his murder conviction because there was insufficient evidence of premeditation and deliberation. We reject the contention for two reasons. First, we can discern from the circumstances that the jury in fact relied on a felony-murder theory to reach its verdict on the charge of first degree murder. Second, the evidence of premeditation and deliberation was sufficient.

Completely undermining defendant's argument is that the jury sustained both the rape and kidnapping special-circumstance allegations. (§ 190.2, former subd. (a)(17)(ii) & (iii), now subd. (a)(17)(B) & (C).) From these verdicts, it is apparent the jury necessarily found—unanimously and beyond a

reasonable doubt—that "[t]he murder was committed while the defendant was engaged in . . . the commission of . . . or the immediate flight after committing" kidnapping and rape. (*Ibid.*) As we explained in parts I.B.5.a. and b., *ante*, substantial evidence supports both the rape and kidnapping convictions. Accordingly, we can deduce from the special circumstance verdicts that the jury relied unanimously on a legally valid felony-murder theory of first degree murder, rendering any alleged deficiency in the evidence of premeditation and deliberation superfluous. (*People v. Marshall* (1997) 15 Cal.4th 1, 38 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

The evidence in any event was sufficient to support a finding of premeditation and deliberation. Although defendant engages in a detailed examination of the three categories of evidence set forth in *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]—planning activity, prior relationship, manner of killing—we have explained that an " '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' (*People v. Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101].) In other words, the *Anderson* guidelines are descriptive, not normative. 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

In this case, a reasonable jury could have inferred from the circumstances of his crimes against Walsh, coupled with his later, similar crimes against A.L., that in the latter half of 1984 defendant engaged in a deliberate plan of sexually preying on defenseless young women late at night on the highway. From these facts, which indicate defendant dumped Walsh's body off the Scotia/Rio Dell Bridge, no doubt hoping she would fall into the river and be swept away, "a rational trier of fact could have determined that defendant's motive in murdering [the victim] was to avoid detection for the sexual and other physical abuses he had committed against her." (*People v. Proctor* (1992) 4 Cal.4th 499, 529 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) The motive of eliminating possible witnesses in cases involving abduction and rape is often inferable from the circumstances of such crimes. (See *People v. Alcala, supra,* 36 Cal.3d at p. 627.) Defendant's choice, moreover, of committing his crimes in isolated or secluded settings further suggests a premeditated plan designed to avoid detection. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237 [278 Cal.Rptr. 640, 805 P.2d 899], and cases cited.) Finally, and most tellingly, the evidence shows that Walsh was strangled with a rope and that her death from asphyxiation would have taken between five

and eight minutes. "Ligature strangulation is in its nature a deliberate act." (*People v. Bonillas* (1989) 48 Cal.3d 757, 792 [257 Cal.Rptr. 895, 771 P.2d 844].) This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act. "A rational finder of fact could infer that [this manner of killing] demonstrated a deliberate plan to kill her." (*People v. Davis* (1995) 10 Cal.4th 463, 510 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

In sum, because the jury necessarily relied on a valid felony-murder theory, we need not decide whether the evidence of premeditation and deliberation was sufficient, but in any event the evidence was clearly sufficient.

> 6. *Challenge to the Jury Instructions: Failure to Give Jury Instruction to View Marolla's Testimony with Caution*

Gary Marolla's testimony obviously was an important piece of the prosecution's case. Although circumstantial evidence (the Louisiana-Pacific logsheets, the forensic blood evidence, and, especially, A.L.'s description of defendant's crimes against her) supported the prosecution's theory that defendant raped and killed Danna Walsh, Marolla's evidence directly linked defendant to Walsh and to the Scotia/Rio Dell Bridge where her body was found. Accordingly, defendant proposed the trial court give the jury this special instruction: "The testimony of an informer who provides evidence against the defendant for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest or by prejudice against defendant."

In support of the instruction, defense counsel argued: "I would like to draw attention to the specific matters which distinguish [Marolla's] testimony from the testimony of other people." Counsel admitted, however, that "this [issue] is covered to some degree [in CALJIC No.] 2.20, but not quite with the same

pinpoint emphasis."[15] The trial court denied defense counsel's request for the special instruction without explanation.

 A trial court must instruct the jury, even without a request, on all general principles of law that are " 'closely and openly connected to the facts and that are necessary for the jury's understanding of the case.' [Citation.] In addition, 'a defendant has a right to an instruction that pinpoints the theory of the defense . . . .' " (*People v. Roldan* (2005) 35 Cal.4th 646, 715 [27 Cal.Rptr.3d 360, 110 P.3d 289].) The court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30 [32 Cal.Rptr.3d 894, 117 P.3d 591].)

In this case, although the court did not state a reason, we conclude the court did not err because the requested instruction was duplicative. The court did instruct the jury with CALJIC No. 2.20 (set out in fn. 15, *ante*). The court also gave CALJIC No. 2.13 (prior inconsistent statement), former No. 2.21 (witness willfully false), and No. 2.23 (prior felony conviction). Under these circumstances, it was not necessary to further instruct on Marolla's relative credibility. *People v. Harrison* (2005) 35 Cal.4th 208 [25 Cal.Rptr.3d 224, 106 P.3d 895] illustrates the point. There, as here, the defendant requested a pinpoint instruction informing the jury that it should view certain witnesses' testimony with " 'greater care' " due to the leniency they may have expected to receive for their testimony. (*Id.* at p. 253.) We affirmed the trial court's refusal to give the special instruction, explaining that "the jury received instructions on the credibility of witnesses in general (CALJIC No. 2.20) and

---

[15] At the time of trial, CALJIC No. 2.20 (1980 rev.) (4th ed. 1979) provided: "Every person who testifies under oath . . . is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.

"In determining the believability of a witness you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following:

"The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified;

"The ability of the witness to remember or to communicate any matter about which the witness has testified;

"The character and quality of that testimony;

"The demeanor and manner of the witness while testifying;

"The existence or nonexistence of a bias, interest, or other motive;

"Evidence of the existence or nonexistence of any fact testified to by the witness;

"The attitude of the witness toward the action in which testimony has been given by the witness or toward the giving of testimony;

"[A statement previously made by the witness that is [consistent] [or] [inconsistent] with the testimony of the witness;] [¶] . . . [¶]

"[An admission by the witness of untruthfulness;]

"[The witness'[s] prior convictions of a felony.]"

on the credibility of a witness who has been convicted of a felony (CALJIC No. 2.23). Together, these instructions adequately informed the jury that the 'existence or nonexistence of a bias, interest, or other motive' and a witness's prior conviction of a felony were factors it could consider in determining the believability of a witness. Defendant cites no authority to support his argument that these instructions were inadequate, and we find none. Accordingly, the court did not err in refusing to give defendant's special instruction [and his] right to a fair trial was not violated." (*Id.* at pp. 253–254.)

Defendant contends the refusal to give his instruction violated his federal constitutional rights to due process of law, a fair trial, and equal protection of the laws (U.S. Const., 5th, 6th & 14th Amends.) because the state has no interest, compelling or otherwise, to have a jury consider the prosecution's theories of the case "while denying that right . . . to people defending themselves against accusation of crime." But because the pattern instructions given to the jury adequately covered the same ground as defendant's special instruction, we cannot conclude defendant was denied the right to have the jury consider his defense theory. Although he argues his instruction more pointedly directed the jury's attention to the "personal advantage or vindication" Marolla may have expected to achieve by his testimony, this issue was adequately conveyed to the jury by CALJIC No. 2.20's admonishment that the jury should consider "the existence or nonexistence of a bias, interest, or other motive" of a witness.

Certainly the parties did not ignore Marolla's credibility, either in questioning him or in closing argument. The prosecutor elicited from Marolla his extensive criminal history, and defense counsel questioned him closely about his attempts to forge a deal with prosecutors to reduce his sentence on various criminal charges. In closing argument, defense counsel called Marolla "a rapist, a kidnap[p]er, a slave trader, a robber, [and a] drug trafficker." He emphasized Marolla's prior felony convictions and the deal Marolla had with Mendocino County law enforcement authorities for a lesser sentence. Counsel stressed the fact Marolla expected to receive, in exchange for his testimony against defendant, some benefit from the prosecutor on his own case involving possession of a machine gun, and observed that Marolla's chosen mode of operation was to "find out about some case and figure out what it is that he can tell somebody so that he can get out [of jail] and who is it he can place the blame on and there's not much a person could do about it." Under the circumstances, the jury could not have failed to appreciate that Marolla's credibility was a central issue in the case and that it should take great care when evaluating it. The court thus did not err in refusing defendant's special instruction; even had the court erred, any error would have been harmless under any standard.

Finally, although defendant notes section 1127a (see fn. 3, *ante*) requires an instruction similar to the one he requested, he acknowledges section 1127a was enacted after he was tried and thus could not have applied to his trial. (*People v. Williams* (1997) 16 Cal.4th 153, 228 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

## II. PENALTY PHASE

### A. *Facts*

The prosecution presented no aggravating evidence at the penalty phase, instead relying on the guilt phase evidence of defendant's crimes.

Defendant presented evidence from his neighbor, Evelyn Rasmussen, and her sons, Darrell Porter and Timothy Porter, who testified to his good character and amiable personality. Joseph Estrada, owner of a wrecking yard in Richmond, testified that defendant was hard working and reliable, and a good mechanic. Estrada's daughter testified defendant taught her to drive and was like a big brother to her. Kenneth Reeves knew defendant through the trucking business and testified he was a good worker with a good attitude.

Defendant's sister, Maudie Bays, testified that when she was a child, she and defendant were very close. He was always protective of her and was taught never to strike a woman. A corrections officer testified that defendant was a cooperative, trouble-free inmate.

Paul Berg, who testified at the initial penalty phase trial and the penalty retrial, was a psychologist who had examined defendant at his request. Dr. Berg found defendant was sane, did not suffer from psychosis, and was of average intelligence with no evidence of brain damage. But defendant suffered from emotional difficulties; he exhibited symptoms of a near schizoid personality, suffered from an avoidant personality disorder, and was socially maladapted. According to Dr. Berg, defendant's emotional development was arrested as a child due to his abandonment by his biological mother and abuse and neglect from his father and three stepmothers. As a result, he never felt that he fit in anywhere, and although he tried to make "all the right moves," such as getting married, he did it only halfheartedly. He self-identified as a hard worker and drew much of his identity from being a truckdriver. Although he appeared to have a stable relationship with his wife, he bottled up a lot of rage and was unable to express it.

### B. *Discussion*

#### 1. *Jury Waiver for the Penalty Phase Retrial*

The jury was unable to reach a unanimous decision on the question of the appropriate penalty. Accordingly, the trial court declared a mistrial and dismissed the jury.[16] Thereafter, defendant raised the possibility that he would waive his right to a jury for the penalty phase retrial. The parties and the court discussed the matter, for a question was raised whether section 190.4 permits a capital defendant to waive his right to a jury for a penalty phase retrial. Defense counsel took the position that defendant could validly do so, arguing that "I find it hard to believe that it was the intention of either the voters or the authors of [the death penalty] initiative to prohibit a defendant from waiving his right to a jury in the circumstances that Mr. Hovarter is now in. [¶] And I would find it difficult to believe that a reviewing Court wouldn't find it erroneous to deny him that right, bearing in mind that both the People and, of course, the defendant for perhaps different reasons have agreed that it is in the best interests of the People's client and our client to do so." Counsel further asserted that the failure of section 190.4, subdivision (b) to make any explicit allowance for waiving a jury for a retrial of penalty was due merely to inadvertence by the drafters of the initiative.[17] The prosecutor apparently agreed.

After taking the matter under submission, the trial court decided to permit defendant to waive his right to a jury. The court then subjected defendant to an extensive voir dire during which defendant affirmed that he understood his rights, had discussed the issue with his attorneys, and wished to waive his right to a jury. In particular, defendant stated he understood that the trial court was aware of certain facts, such as the existence of his taped and written confessions (excluded from evidence in the guilt phase) and his conviction for soliciting A.L.'s murder (also excluded), that would not be presented to a new penalty jury. Defense counsel concurred in the waiver, as did the prosecutor. The trial court thereafter found "the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the sentence of death is warranted rather than life without parole."

Defendant contends that permitting him to waive a jury for the penalty phase retrial violated section 190.4 as well as his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Although the matter is apparently one of first impression, as we explain, we disagree defendant was precluded from waiving his right to a jury.

---

[16] Defendant does not challenge the court's decision to declare a mistrial.

[17] Defense counsel assured the court that the decision to waive a jury was not made lightly and that they had tactical reasons for doing so.

Section 190.4, subdivision (b) provides: "If defendant was convicted by the court sitting without a jury[,] the trier of fact at the penalty hearing shall be a jury *unless a jury is waived* by the defendant and the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people.

"If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury *and shall order a new jury impaneled* to try the issue as to what the penalty shall be. If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole." (Italics added.)

Defendant argues section 190.4 is mandatory—the trial court "*shall* order a new jury impaneled" (italics added)—and that the plain language of the statute precludes a jury waiver for a penalty phase retrial where, as here, the guilt phase was tried to a jury. (See *People v. Johnson* (2002) 28 Cal.4th 240, 244 [121 Cal.Rptr.2d 197, 47 P.3d 1064] ["If the plain language of the statute is clear and unambiguous, our inquiry ends, and we need not embark on judicial construction."].) Although the first paragraph of section 190.4, subdivision (b) states explicitly that a jury may be waived in cases where trial was to the court, defendant emphasizes the second paragraph of the same subdivision does not mention a waiver when the first trial was by jury. (See *People v. Giordano* (2007) 42 Cal.4th 644, 670 [68 Cal.Rptr.3d 51, 170 P.3d 623] [where statute in reference to one subject includes a given provision, omission of the same from a similar or related statute on the same subject suggests a different intention]; *In re Jose A.* (1992) 5 Cal.App.4th 697, 701–702 [7 Cal.Rptr.2d 44] [same].) Finally, defendant contends that to permit a waiver under these circumstances would render the waiver language in the first paragraph surplusage. (See *Johnson*, at p. 247 ["We will avoid an interpretation that makes surplusage of a portion of a statute."].)

■ Although defendant's arguments bear the patina of logic, he engages in such a minute examination of the trees that he misses a very large forest. We need not here set forth an exhaustive exegesis of the history and importance of the right to trial by jury in American jurisprudence.[18] Suffice it

---

[18] "The right to have a jury make the ultimate determination of guilt has an impressive pedigree. Blackstone described 'trial by jury' as requiring that '*the truth of every accusation,* whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors . . . .' 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (emphasis added). Justice Story wrote that the 'trial by jury' guaranteed by the Constitution was 'generally understood to

to say that the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed . . . ," and this amendment applies to the states. (See *Collins v. Youngblood* (1990) 497 U.S. 37, 51 [111 L.Ed.2d 30, 110 S.Ct. 2715]; *Duncan v. Louisiana, supra,* 391 U.S. 145.) Our own state Constitution provides that "[t]rial by jury is an inviolate right and shall be secured to all . . . ." (Cal. Const., art. I, § 16.) But the state Constitution contains a caveat that is pertinent here: "A jury *may be waived* in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (*Ibid.,* italics added.)

 The United States Supreme Court takes the same view. "The short of the matter is that an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, *may waive trial by jury* . . . . There is nothing in the Constitution to prevent an accused from choosing to have his fate tried before a judge without a jury . . . ." (*Adams v. U.S. ex rel. McCann* (1942) 317 U.S. 269, 275 [87 L.Ed. 268, 63 S.Ct. 236], italics added.) Moreover, that the jury trial right may inure to society's benefit does not preclude a waiver: "It is *not* true that any private right that also benefits society cannot be waived. In general, '[i]n an adversary system of criminal justice, the public interest in the administration of justice is protected by the participants in the litigation.' [Citation.] We allow waiver of numerous constitutional protections for criminal defendants that also serve broader social interests." (*New York v. Hill* (2000) 528 U.S. 110, 117 [145 L.Ed.2d 560, 120 S.Ct. 659] [specifically citing waiver of the jury trial right].) Thus, so long as a criminal defendant is competent (see *Cooper v. Oklahoma* (1996) 517 U.S. 348, 364 [134 L.Ed.2d 498, 116 S.Ct. 1373]), he or she may waive the right to be tried by a jury.

 Against this background, defendant's argument is revealed as meritless. Because the default position in criminal cases is a trial by jury, with a jury trial waiver the exception, the first paragraph of section 190.4, subdivision (b) must be read to mean that, despite the fact an accused waived his right to a jury for the guilt phase, the trial court must presume the defendant wants a jury to try the penalty phase unless a jury is again waived.

mean . . . a trial by a jury of twelve men, impartially selected, who must unanimously *concur in the guilt of the accused before a legal conviction can be had.*' 2 J. Story, Commentaries on the Constitution of the United States 541, n. 2 (4th ed. 1873) (emphasis added and deleted). This right was designed 'to guard against a spirit of oppression and tyranny on the part of rulers,' and 'was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties.' *Id.,* at 540–541. See also *Duncan* v. *Louisiana,* 391 U.S. 145, 151–154 [20 L.Ed.2d 491, 88 S.Ct. 1444] (1968) (tracing the history of trial by jury)." (*United States v. Gaudin* (1995) 515 U.S. 506, 510–511 [132 L.Ed.2d 444, 115 S.Ct. 2310], fn. omitted.)

In other words, as an added protection for criminal defendants, a single jury trial waiver given early in the trial process is insufficient; a defendant must reaffirm his waiver for the penalty phase. This view of section 190.4, subdivision (b) explains why the first paragraph includes an explicit mention of waiver.

The meaning of the second paragraph dovetails with the first: If a jury was *not* waived for the penalty phase of trial, it shall be presumed the defendant also desires a jury for any retrial of that phase. This presumption, however, can—as in all situations in which the jury trial right attaches—be overcome with a knowing and intelligent waiver, personally given in open court. Contrary to defendant's suggestion, this interpretation of the two paragraphs in section 190.4, subdivision (b) recognizes no surplusage, no redundancy, and no anomalous preclusion of waiver.

Defendant presents no possible legislative intention why the framers of the 1978 death penalty law would desire to prohibit a capital defendant from waiving his right to a jury trial under these circumstances. Moreover, that the law makes no specific provision for waiving a jury after one jury has convicted a defendant in the guilt phase and sustained one or more special circumstance allegations, but then has hung on the penalty question, is understandable. No doubt defendant and his attorneys had tactical reasons for waiving a jury for the penalty phase retrial, as one counsel stated for the record, but the situation is nevertheless unusual. Although this case apparently is the first to come before this court in such a posture, we conclude that, for the reasons stated, the trial court did not err by accepting defendant's jury trial waiver for the penalty phase retrial.[19]

## 2. *CALJIC No. 8.85*

For the penalty phase retrial, the trial court considered and applied CALJIC No. 8.85, which set forth the various factors in aggravation and mitigation. In fact, defense counsel asserted that, at the suggestion of "both parties," the trial court should be guided by CALJIC No. 8.85. He now claims, however, that this instruction "violates the federal [C]onstitution because it invites the trier of fact to consider inapplicable factors, which introduces confusion, capriciousness, and unreliability into the capital decision-making process." Even assuming for purposes of argument that the error was not invited

---

[19] Defendant makes no argument that his waiver was unknowing, involuntary, or otherwise legally defective.

(*People v. Carpenter* (1997) 15 Cal.4th 312, 420 [63 Cal.Rptr.2d 1, 935 P.2d 708]), we have rejected this precise argument (see, e.g., *People v. Moon, supra,* 37 Cal.4th at p. 42), and defendant presents no reason why our previous pronouncements on the subject were in error. Moreover, because defendant waived a jury and had the penalty decision made by the trial court, it was unlikely in the extreme that he suffered any prejudice in any event. We thus reject the argument.

### 3. *CALJIC. No. 8.88*

In capital cases tried during the 1980's, the jury was usually given CALJIC No. 8.88, which instructed juries how to consider and weigh the mitigating and aggravating evidence. As defendant waived a jury for the penalty phase retrial, the trial court agreed to be guided by the same instruction. Defendant now contends the instruction was "constitutionally flawed" because it "did not adequately convey several critical deliberative principles, and was misleading and vague in crucial respects." He claims these defects violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Examination of the reasons underlying these claims reveals we have rejected them in many previous decisions.

Thus, we conclude the instruction:

(a) is not overly vague for using the words "so substantial" as a modifying phrase (*People v. Abilez, supra,* 41 Cal.4th at p. 530);

(b) is not flawed for providing that the jury should choose the penalty that is "warranted" rather than "appropriate" (*People v. Moon, supra,* 37 Cal.4th at p. 43);

(c) is not flawed for failing to affirmatively require a life sentence if the mitigating factors outweigh the aggravating ones (*People v. Moon, supra,* 37 Cal.4th at p. 42);

(d) is not flawed for failing to affirmatively allow the jury to impose a life sentence even if the aggravating factors outweigh the mitigating ones (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124 [17 Cal.Rptr.3d 710, 96 P.3d 30]); and

(e) is not flawed for failing to assign the burden of proof to one of the parties (*People v. Moon, supra,* 37 Cal.4th at p. 44).

We thus reject defendant's constitutional claims. In any event, because the penalty was tried to the court and not a jury, it is extremely unlikely that defendant was prejudiced by these alleged instructional flaws.

### 4. *Challenges to the Death Penalty Based on International Law*

■ Defendant contends imposition of the death penalty violates "international norms of humanity and decency." In particular, he cites article 6 of the International Covenant on Civil and Political Rights and the laws of the nations of Western Europe. We previously have rejected identical claims. (*People v. Abilez, supra,* 41 Cal.4th at p. 535; see also *People v. Moon, supra,* 37 Cal.4th at p. 48 [specifically addressing the comparison to the laws of Western Europe].) Although defendant argues we should reconsider our previous views on the subject, he offers no reasons why we should do so. He further argues we should apply "a series of safeguards to protect the rights of those facing the death penalty" as adopted by the United Nations Economic and Social Council in 1984,[20] but does not explain why those safeguards should apply here, or how or whether they would change the analysis or result in this case. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' (9 Witkin, Cal. Procedure, (3d ed. 1985) Appeal, § 479, p. 469 . . . .)" (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) We thus reject the contention.

### 5. *Constitutional Challenges to the Death Penalty*

Defendant contends that "[m]any features of this state's capital sentencing scheme violate the United States Constitution, either alone or in combination with each other." We disagree:

(a) "As in *People v. Alfaro* (2007) 41 Cal.4th 1277 [63 Cal.Rptr.3d 433, 163 P.3d 118], defendant contends section 190.3, factor (a) is unconstitutional as applied because it is susceptible of arbitrary, 'wanton and freakish' application. 'We repeatedly have held that consideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty.' " (*People v. Brasure* (2008) 42 Cal.4th 1037, 1066 [71 Cal.Rptr.3d 675, 175 P.3d 632].)

(b) The death penalty law is not unconstitutional for failing to require a burden of proof or persuasion with regard to aggravating circumstances or their

---

[20] See, e.g., United Nations Economic and Social Council, resolution No. 1984/50 (May 25, 1984), Safeguards guaranteeing protection of the rights of those facing the death penalty, found in Resolutions and Decisions of the Economic and Social Council: organizational session for 1984 (Off. Records Supp. 1) page 33, endorsed by the United Nations General Assembly, and adopted by the Seventh United Nations Congress on the Prevention of Crime and the Treatment of Offenders (1986), as discussed in Justice Brennan's dissenting opinion in *Stanford v. Kentucky* (1989) 492 U.S. 361, 390 and footnote 10 [106 L.Ed.2d 306, 109 S.Ct. 2969].

relative weight compared to the mitigating circumstances, or for the determination that death is the appropriate sentence. (*People v. Moon, supra,* 37 Cal.4th at pp. 43–44.) That "[t]wenty-five states require that any factors relied on to impose death in a penalty phase must be proven beyond a reasonable doubt," as defendant contends, does not erode our confidence in the constitutionality of this state's death penalty law. "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." (*Tuilaepa v. California* (1994) 512 U.S. 967, 979 [129 L.Ed.2d 750, 114 S.Ct. 2630] [referring to California law].)

(c) Recent United States Supreme Court decisions applicable to criminal sentencing do not undermine the validity of the state's death penalty law. "We repeatedly have held that neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] affects California's death penalty law or otherwise justifies reconsideration of [our precedents in this area]." (*People v. Morrison* (2004) 34 Cal.4th 698, 731 [21 Cal.Rptr.3d 682, 101 P.3d 568].) *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], decided more recently than *Ring* and *Apprendi,* does not alter the analysis. (*People v. Brasure, supra,* 42 Cal.4th at pp. 1067–1068.) In any event, defendant's proposed requirement of findings "additional" to those reached after the guilt phase is no doubt satisfied by the trial court's extensive written ruling on the issue of penalty.

(d) The death penalty law is not unconstitutional for failing to require intercase proportionality review. (*People v. Abilez, supra,* 41 Cal.4th at p. 534.)

(e) The death penalty law is not unconstitutional for failing to afford equal protection of the laws to capital defendants as compared to noncapital defendants. (*People v. Abilez, supra,* 41 Cal.4th at p. 534.)

### 6. *Alleged Effect of Cumulative Error*

Defendant lastly contends that the cumulative effect of the errors in his trial undermines confidence in the result and violated his Eighth Amendment right to a reliable penalty determination. Having found no errors and certainly no prejudicial ones, we reject this claim as well.

## III. DISPOSITION

The guilt and penalty judgments are affirmed in their entirety.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 17, 2008.