Filed 12/26/13  P. v. Hohner CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062097 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD216918) |
| EDWARD DEAN HOHNER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kerry Wells, Judge.  Affirmed.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

This case arose out of the murder of two men during an illegal drug transaction at Edward Dean Hohner's residence in the City of Oceanside.  A jury convicted Hohner of

two counts of first degree murder (Pen. Code, § 187, subd. (a); victims: Rolando Cebreros (count 1) & Francisco Villalobos (count 2)). The jury found true special circumstance allegations that Hohner (1) committed the murders while engaged in the commission or attempted commission of robbery (Pen. Code, § 211) within the meaning of Penal Code section 190.2, subdivision (a)(12), and (2) committed more than one murder (Pen. Code, § 190.2, subd. (a)(3)). The jury also found true allegations that Hohner personally used a firearm in the commission of the murders (Pen. Code, § 12022.5, subd. (a)(1)). The court sentenced Hohner to two consecutive indeterminate terms of life in prison without the possibility of parole, plus a consecutive determinate eight-year prison term.

Hohner appeals, contending (1) the court committed prejudicial error when it allowed Hohner's friend, Eric Hamilton, to testify Hohner had told him he (Hohner) had killed before and had gotten away with it; (2) the court committed prejudicial error when it allowed former FBI Special Agent James Bird to testify, during the People's rebuttal case, about conversations he had with Silvia Camarena,[1] the mother of a prosecution witness—Arturo Camarena—who testified against Hohner after being granted use immunity; (3) the court committed prejudicial error when it failed to sua sponte instruct the jury to disregard testimony that Hohner was in custody; and (4) cumulative error

---

[1]    We will refer to Silvia by her first name hereafter for the sake of convenience and clarity. We intend no disrespect.

rendered his trial fundamentally unfair.   For reasons we shall explain, these contentions are unavailing.  Accordingly, we affirm the judgment.

FACTUAL BACKGROUND[2]

A. *The People's Case*

1. *The murders*

On February 21, 1997, Rolando Cebreros and Francisco Villalobos were supposed to sell 120 pounds of marijuana to Hohner at his Oceanside home.  According to the testimony of two eyewitnesses— Hohner's friend, Camarena, and Hohner's then-girlfriend, Cynthia Araiza, who had testified about the two murders in this matter before a grand jury and at the preliminary hearing—Hohner did not buy the marijuana from Cebreros and Villalobos.  He shot and killed them and took the drugs.

Cebreros's wife testified that the day before Cebreros was shot, she and Cebreros drove to Hohner's home in a white Volkswagen Jetta so that Cebreros could discuss the details of the drug deal.  Hohner agreed to pay Cebreros $50,000 for the marijuana.

However, Hohner revealed his true plan to his friend Hamilton, who testified that Hohner told him he planned to "rip off" or rob "some guy" (Cebreros and Villalobos) who would be "bringing up 120 pounds" of marijuana.

The day of the murders, Cebreros and Villalobos picked up the marijuana from Don Lupe Cervantes and drove to Hohner's home.  Araiza and Camarena were also at

---

[2]    As Hohner does not challenge the sufficiency of the evidence, our summary of the facts here is brief.  Additional relevant facts will be discussed, *post*, as needed.

Hohner's home. At some point that evening, they were all in the granny flat behind Hohner's house playing pool. Villalobos left to pick up some food, and Cebreros, who called his wife to inform her he had arrived at Hohner's house, later called her again to tell her he was about to head home with the money. Cebreros's wife testified she never spoke to him again.

Although Araiza—a reluctant prosecution witness—repeatedly stated "I don't recall that" when the prosecutor confronted her with her with multiple excerpts from her 2004 grand jury and 2009 preliminary hearing testimony, her prior testimony showed that, as Cebreros and Camarena were playing pool, Hohner whispered to her to leave the room. However, Araiza stayed in the room and Hohner then shot Cebreros in the back of the head.

Camarena's testimony also showed that after Villalobos left to get some food, Hohner shot the person with whom Camarena was playing pool—Cebreros—in the back of the head and that Araiza was standing next to Hohner when Hohner shot Cebreros.

Araiza ran out of the room in shock, and Hohner and Camarena dragged Cebreros's body to the bathroom. Camarena testified that he put the body in the shower.

Shortly thereafter, Villalobos returned to the house carrying food. Camarena testified that Hohner and Villalobos walked into the garage, and he (Camarena) then heard a popping noise after the garage door was closed. Camarena also testified that, after he heard the popping sound, he waited for Hohner. Shortly thereafter, Hohner came out of the garage and went inside the house. Eventually, Hohner and Camarena went

4

inside the garage together, and Camarena saw that Villalobos was dead with a hole in his head.  Camarena indicated that he and Hohner wrapped Villalobos's head with a towel.

At trial, Araiza indicated she could not recall the testimony she gave to the grand jury and at the preliminary hearing that she saw the man who was carrying food (Villalobos) walk into the garage and that she then heard a gunshot.

After Hohner shot Cebreros and Villalobos, he and Camarena stashed the 120 pounds of marijuana, which was in the trunk of Cebreros's white Volkswagen Jetta, in a safe house and then drove to Arizona to get rid of the bodies and Cebreros's car.  Araiza later told a law enforcement officer that Hohner and Camarena cleaned the garage and granny flat with liquid chemicals and a material that looked like sawdust.

a. *Hamilton's testimony about Hohner's alleged admissions*

Hamilton testified that when Hohner next spoke to him on the phone, Hohner told him the "rip-off" did not "go well," but he had gotten the marijuana.  Hamilton also testified that in later conversations, Hohner told him that "the brain comes out of the nose" when someone is shot in the head, and Hohner indicated he had killed before and commented that he had "gotten away with it."

2. *The police investigation*

A former Oceanside Police Department detective testified that when she interviewed Hohner, he initially denied the victims were at his house on February 21, 1997.  Hohner later changed that story and told the detective they were there to hang out, but he said he had not seen them since.  During subsequent police interviews, Hohner

5

admitted that Cebreros and Villalobos were at his house to drop off 120 pounds of marijuana, but he claimed they left after he paid them.

Araiza and Camarena denied knowing anything about the murders for several years. However, in 2004 on the day she was going to testify before a grand jury, Araiza told Special Agent Bird she had changed her life around and wanted to tell the truth about the murders. Araiza then testified about the murders in front of the grand jury.

Camarena testified he agreed to testify against Hohner after he (Camarena) was granted use immunity for his role in the murders.

B. *The Defense*

Hohner's defense was that he paid Cebreros $48,000 for the marijuana, and he did not kill Cebreros or Villalobos. Nora Cisneros, who used to sell marijuana with Don Lupe Cervantes, testified that she and Cervantes had provided the marijuana to the victims in this case, but she said it was 500 pounds, not 120 pounds. The victims were supposed to pay Cisneros and Cervantes $200,000 in cash after they delivered the marijuana. Cisneros testified that Cebreros called her after delivering the marijuana on February 21, 1997, and told her that he had been paid, but she never heard from either of the victims again and never received payment for the marijuana.

Numerous character witnesses testified regarding the character or reputation for honesty and truthfulness of prosecution witnesses Araiza, Camarena, and Hamilton. All of the witnesses testified similarly: Araiza, Camarena, and Hamilton were liars whose testimony could not be trusted.

6

Alfredo Jacobo, who testified in jail blues and admitted he was in custody for importing heroin into the jail, stated he had met Camarena through drug dealings. Jacobo testified that Camarena told him in prison in late 2007 or early 2008 that he had two "calaveras," meaning "skulls," "hits on people," or "kills" on one occasion "under his belt."

DISCUSSION

## I. *HAMILTON'S TESTIMONY REGARDING HOHNER'S ADMISSION*

Hohner first contends the court committed prejudicial error when it allowed Hamilton to testify Hohner had told him he had killed before and had gotten away with it. We reject this contention.

### A. *Background*

During in limine motion proceedings, defense counsel sought to exclude evidence of statements Hohner purportedly had made to Hamilton. According to counsel's offer of proof, Hamilton would testify that several months after the shootings while Hohner and Hamilton were watching a movie in which someone was shot in the head, Hohner said to Hamilton, "Oh, that's not what happens. Brains come out of the nose." Defense counsel argued the evidence of Hohner's statements was not relevant and should be excluded under Evidence Code section 352.

The court stated the evidence "[s]ounds relevant," and Hohner's counsel replied:

> "We have no idea, you know, the context of this movie. We have no idea if [Hohner] is talking about watching a different movie and seeing it happen in a different movie and, oh, that's not what happens. [¶] I mean, it could have been removed in time by two or three years, as opposed to the following week, for example. I just

7

think that it has more prejudicial than probative value and that the court should exclude it under [Evidence Code section] 352."

The prosecutor argued Hohner's statement was admissible as an admission. The prosecutor then indicated Hamilton would also testify that on another occasion Hohner told Hamilton he had shot someone in the head and had "gotten away with it." The prosecutor argued that "those are classic admissions," and they were relevant "to show that [Hohner] committed two murders on that particular date, and these comments were made after that time." Hohner's counsel acknowledged he had not yet objected to the evidence of these latter statements, but told the court, "I am objecting to those as well, Your Honor."

1. *In limine rulings*

The court ruled the evidence of Hohner's statement about what happens to the brain when someone is shot in the head was admissible as an admission by Hohner. The court reasoned that the evidence "does have some relevance" in that "it obviously suggests personal knowledge of the effect of shooting someone in the head, which is what the charge is in this case."

The court also ruled the evidence of Hohner's statements about how he had shot someone in the head and had gotten away with it was admissible for the same reasons.

2. *Hamilton's testimony*

After testifying that Hohner had told him of his plans to rip off 120 pounds of marijuana and later told him that it did not go well, Hamilton testified about certain statements (which the court had referred to as admissions) that Hohner made to him after

8

Cebreros and Villalobos disappeared. Specifically, the following exchange took place between the prosecutor and Hamilton:

"[Prosecutor:] [W]as there an occasion where you and [Hohner] were watching a movie and someone got shot in the head?

"[Hamilton:] Yes.

"[Prosecutor:] Do you recall when that was in relation to when you had been over there [on February 21, 1997]?

"[Hamilton:] Several months later.

"[Prosecutor:] . . . [¶] In the movie, was there something that happened to someone as far as someone getting shot in the head?

"[Hamilton:] Yes.

"[Prosecutor:] Okay. And did [Hohner] make a comment about that?

"[Hamilton:] Yes.

"[Prosecutor:] And what did he indicate regarding that?

"[Hamilton:] He said, *it doesn't happen like that,* that *the brain comes out the nose.*" (Italics added.) [¶] . . .

"[Prosecutor:] And was there also a different time where you and [Hohner] were in a garage and he was talking of killing and he made some comments?

"[Hamilton:] Yes.

"[Prosecutor:] And what was the comment he made?

"[Hamilton:] That *he's done it before and gotten away with it.*

"[Prosecutor:] And when was that in relation to your going over to the scene on February 21st, '97?

9

"[Hamilton:] This was a couple of years later. Maybe three or four." (Italics added.)

B. *Applicable Legal Principles*

Evidence Code section 350 provides that only relevant evidence is admissible. Evidence Code section 210 defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." "'[A] trial court has broad discretion in determining the relevance of evidence.'" (*People v. Smithey* (1999) 20 Cal.4th 936, 973.)

1. *Evidence Code section 1101*

Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Thus, evidence of other crimes or bad acts is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a).)

Evidence Code section 1101, subdivision (b) "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, *supra*, 7 Cal.4th at p. 393, fn. omitted.) Specifically, that subdivision provides that nothing in Evidence Code section 1101 "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as

10

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

### 2. *Evidence Code section 352*

If the trial court determines that uncharged misconduct is admissible under Evidence Code section 1101, subdivision (b), it must then determine whether the probative value of the evidence is " 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 404; Evid. Code, § 352.)

The California Supreme Court has explained that "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which *uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues*. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

### 3. *Standard of review*

We review the trial court's rulings under Evidence Code sections 1101 and 352 for an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) We will not

disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

C. *Analysis*

As noted, Hohner claims the court prejudicially erred in allowing Hamilton to testify that after Cebreros and Villalobos disappeared, Hohner had told him that he had killed before and had gotten away with it. In support of this claim, Hohner asserts (1) his "supposed admission to committing an unsolved murder was not relevant to any issue in the case because the context was insufficient to infer he was admitting . . . the charged murders because any vague admission to committing a different murder had no tendency to prove he committed the charged murders"; (2) this evidence was barred by Evidence Code section 1101 because it "only tended to prove [his] criminal propensity"; (3) Hamilton's testimony should have been excluded because it "was substantially more prejudicial than probative"; and (4) [i]ts admission violated [Hohner's] federal constitutional right to due process and a fair trial." These assertions are unavailing.

"An admission is often compared to a confession. A confession is a declaration, or acknowledgment sufficient to establish guilt of the crime. [Citation.] An admission is similar to but less than a confession. It is 'an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of guilt.'" (*People v. Zichko* (2004) 118 Cal.App.4th 1055, 1059.)

12

Here, we conclude the court did not abuse its discretion in ruling that the evidence of Hohner's statement about what happens to the brain when someone is shot in the head and of his statements suggesting he had shot someone in the head and asserting he had gotten away with it was admissible.  The decision in *People v. Hovarter* (2008) 44 Cal.4th 983 (*Hovarter*) is instructive.

In *Hovarter*, the defendant kidnapped, raped, and killed one woman named Walsh. Four months later he kidnapped, raped, and attempted to murder a second woman, A.L. (*Hovarter, supra,* 44 Cal.4th at pp. 989-990, 992.)  The defendant was convicted of the crimes he committed against the first victim, Walsh, before he was tried for his crimes against the second victim, A.L.  (*Id*. at p. 992.)  Prior to trial in the case charging the defendant with the crimes committed against Walsh, the parties assumed the second victim, A.L., would testify that the defendant had told her both that he knew what he was doing and that he had committed a similar crime in the past.  (*Id*. at p. 1006.)  The defendant brought a pretrial motion under Evidence Code sections 1101 and 352 to exclude all evidence of his crimes against A.L.  (*Ibid*.)  In opposing the motion, the People noted that a police officer, Detective Pintane, had interviewed A.L., and, according to the detective, she had told him the defendant had told her it "wasn't the first time he had done this."  (*Ibid*.)  The trial court denied the motion, concluding that the evidence of the defendant's statements was admissible "as an admission by the

13

defendant," which the Court of Appeal construed as a reference to an exception to the hearsay rule set forth in Evidence Code section 1220.[3] (*Hovarter*, at p. 1006.)

At trial in *Hovarter*, the testimony of both A.L. and Detective Pintane provided evidence of defendant's statements that linked his crimes against A.L. to those committed against Walsh. (*Hovarter*, *supra*, 44 Cal.4th at p. 1006.) Specifically, after A.L. described for the jury her recollections of being kidnapped, raped, shot twice in the head, and left for dead, the prosecutor asked her, "Did the defendant ever tell you that he had done this sort of thing before[?]" (*Ibid*.) A.L. replied, "Yes. He told me that he knew what he was doing." (*Ibid*.) A.L. indicated she understood the defendant's statement to mean he knew what he was doing in terms of raping her. (*Ibid*.) The prosecution also presented Detective Pintane's testimony that A.L. told him "her assailant said to her that this was not the first time that he had done this and that he knew what to do." (*Id*. at p. 1007.)

On appeal, the *Hovarter* court rejected the defendant's contention that his statements to A.L. that he knew what he was doing and it was not his first time were too speculative and vague to support the inference that he had previously committed a similar set of crimes (against Walsh). (*Hovarter*, *supra*, 44 Cal.4th at p. 1009.) The Court of Appeal concluded that, although the defendant's statements were "somewhat vague," the

---

3    Evidence Code section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

14

trial court "was within its discretion in concluding that they permitted the inference he had committed a similar crime in the past." (*Ibid*.)

The Court of Appeal also rejected the defendant's contention that the evidence of his statements should have been excluded on the ground it was not relevant. (*Hovarter, supra*, 44 Cal.4th at p. 1009.) The *Hovarter* court reasoned that "defendant's comment to A.L. that he knew what he was doing suggested he had raped and killed before" (*id*. at pp. 1009-1010), and, thus, "it was relevant and . . . admissible to show his state of mind." (*Id*. at p. 1009, citing *People v. Gurule* (2002) 28 Cal.4th 557, 652 ["defendant's statement that he had 'killed before' admissible to show his state of mind in forming the plan to commit the crimes"].) The Court of Appeal added that "[i]ts weight was for the jury to decide." (*Hovarter*, at p. 1010.)

Here, although the statements Hohner allegedly made to Hamilton—that the brain comes out the nose when someone is shot in the head and that he had done it before and had gotten away with it—are somewhat vague like the statements made by the *Hovarter* defendant, they reasonably suggest (as the trial court found) that Hohner had personal knowledge of the effect of shooting someone in the head. Also, Hamilton's testimony, if credited, shows that Hohner made those statements after the victims in this case disappeared. We conclude the evidence of Hohner's statements had some tendency in reason to prove that he intentionally killed the victims in this case by shooting them in the head, as Camarena testified he did. The weight of this evidence, like the weight of the evidence of the statements of the *Hovarter* defendant, "was for the jury to decide" (*Hovarter, supra*, 44 Cal.4th at p. 1010).

15

Hohner's contention that this evidence was barred by Evidence Code section 1101 because it "only tended to prove [his] criminal propensity" is unavailing. We have concluded the court correctly ruled that the evidence of Hohner's statements to Hamilton was relevant and admissible as an admission showing he committed the murders for which he was prosecuted in this case. The record shows the evidence of Hohner's statements was not offered to show that he committed uncharged murders and, thus, that he had a criminal disposition to commit the charged murders. For example, during closing arguments, the prosecutor stated that Hohner "made admissions about *the murders*" (italics added) and that he told Hamilton, "I've done it before and gotten away with it." The prosecutor's argument indicated Hohner's admissions specifically pertained to the murders of Cebreros and Villalobos charged in this case.

We also conclude Hohner's contention that the evidence of his statements to Hamilton should have been excluded because it "was substantially more prejudicial than probative" is also unavailing. Hamilton's testimony about Hohner's statements was very brief, and the jury had already heard Camarena describe the shootings, as well as Araiza's prior testimony about the shootings to the grand jury and at the preliminary hearing. For purposes of Evidence Code section 352, the evidence of Hohner's statements is not the type of unduly prejudicial evidence that "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues" (*People v. Karis*, *supra*, 6 Cal.3d at p. 638). Furthermore, the record shows the court properly instructed the jury under CALCRIM No. 358 that the jury was to decide whether

16

Hohner made any of the statements, and, if he did, how much importance the statements should be given.[4]

We also reject Hohner's contention that admission of the evidence of his statements to Hamilton "violated [his] federal constitutional rights to due process and a fair trial."  This contention is based on the premise that the evidence of his statements was "other crimes" evidence about "another unsolved murder" that was used to prove criminal propensity in violation of Evidence Code section 1101, subdivision (a) (discussed, *ante*).  We have already rejected this premise.  In any event, "[t]he 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'"  (*Hovarter, supra,* 44 Cal.4th at p. 1010.)

Even if we were to conclude the court erred in admitting the evidence of Hohner's statements to Hamilton, we would conclude any such error was harmless because Hohner has not shown, and cannot demonstrate, it is reasonably probable the jury would have reached a more favorable verdict if the court had excluded that evidence.  (See *People v. Fuiava* (2012) 53 Cal.4th 622, 671 [applying the *Watson*[5] harmless error test to a claim of erroneous admission of evidence].)  As already discussed, two eyewitnesses─Camarena and Araiza─testified to the details of the double murder in this

---

4    The court gave the following version of CALCRIM No. 358: "You have heard evidence that [Hohner] made . . . oral or written statements before the trial.  You must decide whether [he] made any of these statements, in whole or in part.  If you decide that [Hohner] made such statements, consider the statements, along with all the other evidence, in reaching your verdict.  It is up to you to decide how much importance to give to the statements."

5    *People v. Watson* (1956) 46 Cal.2d 818, 836.

case.  Although Araiza retreated from her prior incriminating grand jury and preliminary hearing testimony by repeatedly and evasively stating "I don't recall" when the prosecutor confronted her with excerpts from the transcripts of her prior testimony, she was impeached by evidence that she had reinitiated contact with Hohner immediately after her testimony at the 2009 preliminary hearing, and she had maintained contact with him after that time.  As already discussed, the prosecution also presented evidence that Hohner revealed to Hamilton his plan to steal 120 pounds of marijuana from the victims and that he later told Hamilton that the rip-off did not go well.

## II.  *ADMISSION OF (1) SPECIAL AGENT BIRD'S REBUTTAL TESTIMONY ABOUT HIS CONVERSATIONS AND VISITS WITH SILVIA AND (2) THE LETTER SILVIA RECEIVED*

Hohner also claims the court committed prejudicial error when it (1) allowed Special Agent James Bird to testify during the People's rebuttal case about conversations he had with Silvia, the mother of a prosecution witness, Camarena, who testified against Hohner after being granted use immunity; and (2) admitted into evidence a letter that Silvia received.  These claims are unavailing because Hohner has forfeited them, and even if the claims had been preserved for appellate review, any error was harmless.

### A.  *Background*

During the defense case, Barbara Peterson, the manager of the apartment complex where Camarena's mother, Silvia, lived, testified about Camarena's reputation in the community that he was not trustworthy.  When defense counsel asked Peterson whether Special Agent Bird had "paid a number of visits" to the apartment complex in order to speak to Silvia in relation to this case, she replied, "Yes."

18

Defense counsel also asked Peterson whether she had noticed any sort of "special relationship" between Special Agent Bird and the Camarena family. Peterson indicated that Silvia continued to call Special Agent Bird for information, even though he had retired, and that there was a "lingering relationship."

Prior to Peterson's cross-examination, the prosecutor requested a sidebar conference, which was not reported. Following the sidebar, Peterson testified on cross-examination that she did not know the reason for the repeated contact between Special Agent Bird and Silvia and that she had not heard any of their conversations.

Later, the parties revisited the issue outside the presence of the jury. The court summarized the prior unreported sidebar discussion, indicating that the prosecutor sought to recall Special Agent Bird to explain why he repeatedly contacted Silvia in order to counter the suggestion that Peterson's testimony about the contacts and development of a relationship between Special Agent Bird and Silvia showed that Special Agent Bird may have been trying to influence Camarena's testimony. The court indicated the prosecutor had made an offer of proof that Silvia had received what she believed to be a threatening letter from Hohner, and Special Agent Bird contacted her to talk to her about her concerns about that letter.

The prosecutor indicated he only sought to have Special Agent Bird testify he had been contacting Silvia because she had received the letter before the preliminary hearing and felt frightened. Defense counsel argued the letter was not threatening and sought to introduce the entire letter into evidence in order to demonstrate to the jury that it was not threatening.

19

Addressing the prosecutor, the court observed:

> "[T]here is certainly a suggestion or an inference that the letter [Silvia] received was threatening. She interpreted it as threatening. So [defense counsel] is indicating that if you do go there, he wants to be able to admit the entire letter. Do you have any objection to that?"

The prosecutor replied he had no objection "if the circumstances of the letter are put in," including the circumstances that Silvia saw it was from Hohner after she read it and that Hohner had put someone else's name on the return envelope.

Defense counsel raised a general objection to "this whole inquiry," stating:

> "Your Honor, *I would object to this whole inquiry*. First of all. Silvia Camarena is not a witness in this case. Second of all, Barbara Peterson basically just said that Agent Bird was visiting Silvia Camarena frequently, and therefore she assumed that there was some special relationship there. That can mean any number of things." (Italics added.)

The court then asked Hohner's counsel:

> "Why would you be asking [Peterson], then, about Agent Bird's contact with [Silvia] Camarena" *You raised the subject*." (Italics added.)

The court then observed:

> "*There is no other reason for that testimony regarding the contact and/or relationship with Agent Bird other than to suggest he was attempting to influence them, influence their testimony*, and that's the clear inference that was drawn from that. [¶] I mean, I'm just sitting here listening just like a juror, and that's, to me, the only inference that can be drawn from that. And if in fact that's not why [Agent Bird] was visiting [Silvia Camarena], then that's not fair for the prosecution not to be able to explain that." (Italics added.)

20

1. *Ruling*

The court then ruled the testimony and letter were admissible. Specifically, addressing defense counsel, the court stated:

> "So I am going to let [the prosecutor] explain it. And if [the People] put the evidence on regarding the letter and you want to put in the full letter to show it's not threatening, I'm going to let you do that. I'm going to let you both explain the whole circumstance, because the jury is entitled to know."

Defense counsel replied, "That's fine."

2. *Special Agent Bird's rebuttal testimony and admission of the letter into evidence*

During the People's rebuttal case, Special Agent Bird testified he had contacted Silvia during 2008 and 2009 in order to make sure her son would be available to testify as a witness. During one of those contacts, in March 2009, Special Agent Bird went to Silvia's residence to deliver a subpoena requiring Camarena to testify at the preliminary hearing in this case. Silvia handed a letter to Special Agent Bird and indicated she took it as a threat. According to Special Agent Bird, Silvia felt threatened by the letter because the envelope showed it was from someone at the George Bailey Detention Center and she did not know the person whose name was on the envelope, but as she read the letter she realized it was from Hohner. Silvia was concerned by the fact that Hohner had sent the letter through a former prisoner who had been released from prison. She indicated concern that this former prisoner knew where she lived and might harm her or her family in some way.

21

Special Agent Bird explained that he later had other conversations and meetings with Silvia regarding the letter and also to serve subpoenas on her son. When asked whether he ever contacted Silvia "to tell her what her son should say in court," Special Agent Bird replied that he "encouraged [Silvia] many times to have her son be truthful with us."

On cross-examination, Special Agent Bird acknowledged that the letter Silvia had handed to him in March 2009 was signed "El Boy," which was Hohner's nickname. Defense counsel asked Special Agent Bird whether he would agree the language in the letter did not convey "any implicit or indirect or direct threat of any kind." The prosecutor objected, and the court sustained the objection "on relevance grounds."

Defense counsel then asked, "[D]o you recall any particular words that could be perceived as threats or intimidation?" The court again sustained an objection by the prosecutor on relevance grounds and stated: "The letter speaks for itself. The jurors are going to get to see it."

After the last witness testified, the letter Hohner sent to Silvia was admitted into evidence as People's exhibit 16. Defense counsel indicated he had no objection.

B. *Analysis*

1. *Special Agent Bird's rebuttal testimony*

Hohner first claims the court's admission of Special Agent Bird's rebuttal testimony about his visits and conversations with Silvia and her statements to him about the letter she received was prejudicial error because (1) the testimony was inadmissible hearsay, and (2) its admission violated his federal constitutional right to confront his

accusers.  The Attorney General argues this claim "should be deemed forfeited for failure to properly object below."  We agree.

Evidence Code section 353, subdivision (a) provides:  "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and *so stated as to make clear the specific ground of the objection or motion*."  (Italics added.)

In accordance with this statute, the California Supreme Court has "established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal."  (*People v. Dykes* (2009) 46 Cal.4th 731, 756 (*Dykes*); see also *People v. Partida* (2005) 37 Cal.4th 428, 433-434 (*Partida*) ["'In accordance with this statute, we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.'"].)

In *Partida*, the Supreme Court explained the "important purposes" of the requirement of a specific objection:  "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.  If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one

23

stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Partida*, *supra*, 37 Cal.4th at pp. 434-435.)

Here, we deem forfeited Hohner's claim that the court committed prejudicial error by admitting the challenged portions of Special Agent Bird's rebuttal testimony. Although Hohner objected through counsel to the introduction of Special Agent Bird's rebuttal testimony, he failed to make a specific objection on the grounds now asserted on appeal. Specifically, defense counsel stated, "I would object to this whole inquiry." He then stated: "First of all, Silvia Camarena is not a witness in this case. Second of all, Barbara Peterson basically just said that Agent Bird was visiting Silvia Camarena frequently, and therefore she assumed that there was some special relationship there. That can mean any number of things."

By failing to make in the trial court a specific objection to the admission of Special Agent Bird's testimony on the same grounds he now asserts on appeal, Hohner denied the prosecution, as the party offering the testimony, the opportunity to respond appropriately, and he also denied the trial court the opportunity to make a fully informed ruling, thereby thwarting the "important purposes" of the statutory requirement of a specific objection. (*Partida*, *supra*, 37 Cal.4th at pp. 434-435.)

In light of our conclusion, we need not address the Attorney General's arguments that (1) Special Agent Bird's testimony was "classic rebuttal testimony", and that (2) the prosecution introduced Special Agent Bird's testimony for a nonhearsay purpose because his testimony "was not offered to prove that [Hohner] was threatening Silvia; it was

24

offered to explain the reason for the repeated contact between Agent Bird and Silvia—that she *felt* threatened."

2. *The letter Silvia received*

Hohner also claims the court prejudicially erred by admitting into evidence the letter Silvia received because any fear she may have felt when she received the letter was not relevant, and "[t]he letter lacked an adequate foundation." We deem this claim forfeited because Hohner has not shown, and cannot demonstrate, that he objected in the trial court to the admission of this evidence on the same grounds he now asserts on appeal. (See Evid. Code, § 353, subd. (a); *Dykes*, *supra*, 46 Cal.4th at p. 756.)

On the contrary, assuming for the sake of argument that the admission of the letter was erroneous, the record shows Hohner invited any such error. Under the doctrine of invited error, a party who induces the commission of an error is generally estopped from asserting the alleged error as grounds for reversal. (*People v. Mays* (2007) 148 Cal.App.4th 13, 37.) The California Supreme Court has explained that "'[t]he doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.)

Here, the record shows Hohner's counsel made a tactical decision to seek admission of the letter in question. Specifically, defense counsel argued that the letter Silvia received was not threatening, and the entire letter should be admitted into evidence

25

in order to demonstrate to the jury that it was not threatening.  When the court ruled the letter was admissible, defense counsel responded, "That's fine."  Later, when the court admitted the letter into evidence, defense counsel indicated he had no objection.  Hohner has forfeited his claim of error.

3. *Any error was harmless*

Even if we were to conclude Hohner did not forfeit his claims of error, and we were to assume the court erred, we would also conclude any such error was harmless under any standard of prejudice because the evidence of Hohner's guilt was overwhelming.  As already discussed, the prosecution presented eyewitness testimony establishing the details of the double murder Hohner committed in this case.  The prosecution presented evidence that Hohner revealed to Hamilton his plan to steal 120 pounds of marijuana from the victims and that he later told Hamilton that the rip-off did not go well.  The prosecution also properly presented evidence showing that, after the murders, Hohner confided to Hamilton he had killed before and had gotten away with it.

### III.  *CLAIM OF INSTRUCTIONAL ERROR*
### (*HOHNER'S CUSTODY STATUS*)

Hohner also claims the court committed prejudicial error when it failed to sua sponte instruct the jury to disregard testimony that Hohner was in custody.  This claim is unavailing.

A. *Background*

Four witnesses—Araiza, Special Agent Andrew Pappas, Hamilton, and Special Agent Bird—testified to the fact that Hohner was in custody, and the record shows that

26

most of the testimony about Hohner's custody status was elicited by his counsel. When the prosecutor asked Araiza about her contact with Hohner in recent years, she briefly testified, without a defense objection, about her visits with him in jail.

The prosecutor planned to impeach Araiza's testimony regarding the extent of her contact with Hohner by calling Special Agent Pappas to testify about the number of times Araiza visited Hohner and the number of phone call and e-mails exchanged between them. Recognizing that the introduction of this evidence might emphasize for the jury the fact that Hohner was in custody, the prosecutor brought the issue to the attention of the court and defense counsel outside the presence of the jury before presenting Special Agent Pappas's testimony. Defense counsel initially objected to the proposed testimony, arguing it was irrelevant hearsay. The court asked defense counsel whether he had any concern about the fact that Hohner was in custody and noted that Araiza had already testified to Hohner's custody status. After observing that Hohner's custody status was "going to come out" if a foundation was laid that Special Agent Pappas had monitored the jail contacts, the court again asked defense counsel whether he had any concern about that. In response, defense counsel objected "to the entire line of questioning." The court overruled the objection and ruled the testimony was admissible. The court then asked defense counsel had any other concerns or suggestion, and counsel replied, "No, Your Honor."

Later, during his testimony on direct examination, Special Agent Pappas testified to the number of times Araiza had visited or communicated with Hohner since 2009. He

27

did not state how he learned about these communications, and he did not testify that Hohner was in custody during this time period.

On cross-examination, defense counsel elicited the fact that Hohner was in custody. Noting that Special Agent Pappas had testified to 21 phone calls between Araiza and Hohner, defense counsel asked him, "That's looking at phone numbers from the jail log, correct?" Special Agent Pappas answered, "Yes."

During Hamilton's direct examination, the prosecutor asked him when he first met Araiza. Without a defense objection, Hamilton replied that he met Araiza right after Hohner got out of jail in 1995 or 1996.

During the defense case, defense counsel called Special Agent Bird to testify about results of forensic tests. Defense counsel asked him, "Now, you're aware that Mr. Hohner is in custody right now for distributing marijuana, correct?" After Special Agent Bird indicated he was aware, defense counsel elicited testimony that Hohner had been in custody for many years by asking, "And you're aware that he has been in custody for a federal conspiracy to distribute marijuana conviction and he's been in custody since November of 2003 for that offense, correct?" Special Agent Bird answered, "That's right." Special Agent Bird then confirmed for defense counsel that, because Hohner was in custody, law enforcement authorities always had access to Hohner and knew where to find him.

During his closing argument, defense counsel told the jury that Hohner "is a marijuana dealer and is serving time for that." Counsel later stated that Hohner had been in custody since 2003 and told the jury he wanted them to know about Hohner's custody

28

status so they would not assume that he had "fled the jurisdiction knowing he was wanted for murder and they had to pluck him out of Mexico." Hohner's counsel then reiterated, "He has been here in the United States in continuous federal custody since 2003."

B. *Applicable Legal Principles*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744.) We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

C. *Analysis*

Hohner asserts that, in light of the repeated references to his incarceration during trial, his convictions should be reversed because the court's failure to instruct the jury on "how to consider, if at all, [his] custodial status" undermined the presumption of innocence and violated his federal constitutional right to due process. Hohner acknowledges his trial counsel did not request such an instruction, stating he "realizes that when the issue is just the defendant's custodial status, as opposed to hi[s] being visibly shackled in front of the jury, that the trial court's instructional duty is not sua sponte." Agreeing with the Attorney General, Hohner also acknowledges in his reply brief that "no case has found a sua sponte duty to instruct jurors to disregard or limit their consideration of a defendant's custodial status when the evidence only shows the defendant is in custody and is not shackled in court."

As a preliminary matter, the Attorney General asserts Hohner has forfeited his claim under the doctrine of invited error because he "cannot complain on appeal that the trial court erroneously *admitted* evidence elicited by his own attorney."  (Italics added.)

As already discussed, under the doctrine of invited error a party who induces the commission of an error is generally estopped from asserting the alleged error as grounds for reversal.  (*People v. Mays*, *supra*, 148 Cal.App.4th at p. 37.)  However, "'it also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.'" (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 49.)

Here, the record discussed, *ante*, establishes that most of the testimony the jury heard about Hohner's incarceration was elicited by his trial counsel.  Defense counsel's closing argument shows he made the tactical decision to emphasize the fact that Hohner had been in federal custody since 2003 in order to disabuse the jury of any inference he had demonstrated consciousness of guilt by fleeing the jurisdiction after the victims were murdered.

However, as Hohner correctly asserts, he "is not objecting to *admission* of the evidence of his custodial status─he is objecting to the trial court's failure to explain its significance to jurors."  (Italics added.)  Accordingly, we conclude Hohner has not forfeited his claim of error.

With respect to the merits, we begin our analysis by noting that "the mere fact that the jury is made aware of a defendant's custodial status does not deprive the defendant of his constitutional rights."  (*People v. Valdez* (2004) 32 Cal.4th 73, 121.)  In *Valdez* , the California Supreme Court explained that, "'in certain circumstances a jury inevitably will

30

learn a defendant is in custody for the current charged offense, for example where the jury is presented with the testimony of a jailhouse informant.'" (*Ibid.*, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1336.)

Here, as the Attorney General correctly asserts, "the references to [Hohner's] custodial status . . . served valid purposes." The testimony regarding the jail e-mails and phone calls was admitted as impeachment evidence to attack Araiza's credibility. Defense counsel elicited most of the other references to Hohner's incarceration in order to demonstrate the agents' access to him and show he had not fled the jurisdiction.

However, we need not decide whether the court had a duty to instruct the jury sua sponte on how to consider Hohner's custodial status because, even if we were to assume the court erred by failing sua sponte to give such an instruction, any such error was harmless under any standard of prejudice. The record shows the jury was fully and properly instructed on the presumption of innocence, as well as the prosecution's burden of proving all elements of the charged offenses beyond a reasonable doubt. The jury was also instructed not to let bias or prejudice influence the verdicts. In addition, the court gave a "witness in custody" instruction with respect to witness Alfredo Jacobo, who testified in jail attire. Although that instruction did not mention Hohner, it informed the jury that "[t]he fact that a witness is in custody does not by itself make a witness more or less believable." We presume the jurors understood and followed the trial court's instructions. (*People v. Hinton* (2006) 37 Cal.4th 839, 871.) The jury having been given the foregoing instructions, we conclude there is no reasonable likelihood it improperly inferred Hohner was guilty of the charged offenses based on the references to his

31

custodial status.  In any event, as we have already discussed, the evidence of his guilt was overwhelming.

## IV.  *CLAIM OF CUMULATIVE ERROR*

Last, Hohner contends cumulative error rendered his trial fundamentally unfair. We reject this contention.

"If none of the claimed errors were individual errors, they cannot constitute cumulative errors that somehow affected the . . . verdict."  (*People v. Beeler* (1995) 9 Cal.4th 953, 994, abrogation on other grounds recognized by *People v. Pearson* (2013) 56 Cal.4th 393, 462.)

Here, we have concluded that all of Hohner's other claims of error are unavailing. Specifically, we have concluded the court properly admitted evidence that Hohner admitted to a friend that he had killed before and had gotten away with it.  We have concluded Hohner forfeited his claims that the court erroneously admitted into evidence Special Agent Bird's rebuttal testimony and the letter Silvia received; and, even if the court erred, any such error was harmless.  Last, we have concluded that, assuming without deciding the court had a duty to instruct the jury sua sponte on how to consider Hohner's custodial status, Hohner's claim that the court erred by failing to give such an instruction is unavailing because any such error was harmless under any standard of prejudice.  We also conclude Hohner has not met his burden of showing the court committed cumulative error that rendered his trial fundamentally unfair.

DISPOSITION

The judgment is affirmed.

|                                        |
| -------------------------------------- |
|                        NARES, Acting P. J. |

WE CONCUR:

|                          |
| ------------------------ |
|        McINTYRE, J.      |


|                          |
| ------------------------ |
|       O'ROURKE, J.       |